<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 4.0 Transitional//EN">
<!-- saved from url=(0100)file://C:\Documents and Settings\slanglois\Local Settings\

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MERRYL D. WEISS, wife of and, | * | CIVIL ACTION |
| ROBERT U. WEISS, JR., M.D. | * | CASE #06-3774 |
| | * | |
| Plaintiffs | * | SECTION "R" |
| | * | JUDGE VANCE |
| VERSUS | * | |
| | * | |
| ALLSTATE INSURANCE COMPANY | * | MAGISTRATE #5 |
| | * | (CHASEZ) |
| Defendant | * | |

*******************************

* * * * * *

VIDEOTAPED DEPOSITION taken for PERPETUATION of JAMES G. NEVA, Post Office Box 1293 Ocean Park, Washington 98640, taken on Saturday, March 17, 2007, at the Law Office of Richard C. Trahant, 2908 Hessmer Avenue, Metairie, Louisiana 70002.

* * * * * *

REPORTED BY:
    Terri Weber Wenning, RPR, CCR
    Certified Court Reporter

<HR>

Page 2

1   A P P E A R A N C E S
2
3   REPRESENTING THE PLAINTIFFS, MERRYL D. WEISS,
    WIFE OF AND. ROBERT U. WEISS, JR., M.D.
4
5   LAW OFFICES OF RICHARD C. TRAHANT
    (BY: RICHARD C. TRAHANT, ESQUIRE)
6   2908 Hessmer Avenue
    Metairie, Louisiana 70002
7
8   SHERMAN - DENENEA, L.L.C.
    (BY: JOHN H. DENENEA, JR., ESQUIRE)
9   4240 Canal Street
    New Orleans, Louisiana 70119
10
11
12  REPRESENTING THE DEFENDANT,
    ALLSTATE INSURANCE COMPANY
13
14  BARRASSO, USDIN, KUPPERMAN,
    FREEMAN &amp; SARVER, L.L.C.
15  (BY: MEREDITH CUNNINGHAM, ESQUIRE)
    (BY: LAURA GRAVENER, ESQUIRE)
16  909 Poydras Street
    Suite 1800
17  New Orleans, Louisiana 70112
18
19
20  VIDEOTAPED BY:
    GREG CASSIN, DEPO-VUE, INC.
21  3200 Ridgelake Drive, Suite 205
    Metairie, Louisiana 70002
22
23  ALSO PRESENT:
    Merryl D. Weiss
24  and Robert U. Weiss, Jr., M.D., Plaintiffs
25

Page 3

## INDEX

3   Caption                              1
4   Appearance                           2
5   Stipulation                          4
6   Reporter's Page                    174
7   Reporter's Certificate             175
8
9
10  Examination by:
11    Mr. Richard C. Trahant    5, 16, 161
12    Ms. Meredith Cunningham    10, 133

## EXHIBIT INDEX

17  Exhibit A                          152
18  Exhibit B                          155
19  Exhibit C                          158

Page 4

## STIPULATION

It is stipulated and agreed by and among counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes, under the applicable Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * * * *

TERRI WEBER WENNING, RPR, CCR, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

JAMES G. NEVA, after having been first duly sworn by an authorized court reporter, was examined and testified as follows:

EXAMINATION BY MR. TRAHANT:

Q. Good morning, Mr. Neva, would you please state your full name for the record?

A. James Gerald Neva.

Q. And what's your current address?

A. Post Office Box 1293 Ocean Park, Washington 98640.

Q. And, Mr. Neva, what's your current occupation?

A. I'm the manager at the Port of Ilwaco.

Q. Okay. And just so that the jury understands, where is Ilwaco and what type of port is it?

A. It's at the southeast corner of the State of Washington just across the river from Astoria, Oregon and it is predominantly a fishing port, commercial and recreational fishing, with some upland leases, and an airport.

Q. How were you employed on August 29th of 2005 when hurricane Katrina struck

1 Louisiana?
2  A. August 29th I was -- I don't believe I
3 was employed. I was retired.
4  Q. Okay. And you were doing, as I
5 understand it, some consulting work for an
6 engineering firm?
7  A. Not at that time. I believe I began
8 work for Pacific International Engineering in
9 October.
10  Q. Where is Pacific International
11 Engineering located?
12  A. Edmonds, Washington.
13  Q. And would you quickly, Mr. Neva, give
14 the jury a run-down of your educational
15 background?
16  A. I have a degree in civil engineering
17 from St. Martin's College in Olympia.
18  Q. Okay. And over what part of your
19 professional adult life have you had jobs
20 engaging in the practice of engineering?
21  A. When I graduated from college in 1972
22 I went to work for a small consulting firm in
23 Olympia for about two years, I believe. They
24 majored in doing work on water, sewer, and
25 streets, a lot of subdivision work. Then I had

1 took over my father's land surveying business
2 in 1974. And I -- I had grown up working in
3 the -- for him in the land surveying business
4 since I was 12 years old.
5  And then I talked my father into
6 coming out of retirement and coming back into
7 partnership with me and we worked together for
8 a couple years.
9  So then in '77 I left private practice
10 and went to work for Pacific County Engineers'
11 office. I worked there for ten years, till
12 1987. Then I went to work for Pacific County
13 Title in South Bend, Washington for three years
14 as a title officer. Then in 1990, January of
15 1990, I believe, I went to work for the City of
16 West Port on the coast of Washington as the
17 public works director where I oversaw the
18 street department, the water department, sewer
19 department, parks department, building
20 department, and planning department.
21  Then in November of '91 I went -- I
22 took the position of manager at the Port of
23 Willapa Harbor where I managed three industrial
24 parks, three marinas, and a general aviation
25 airport. And 12 years later, in November of

1 '03, I went to work for the Port of Grays
2 Harbor in Aberdeen, Washington as the marine
3 terminals manager. I did that for two years.
4 Then I retired in, I believe, September of '05.
5  And Pacific International Engineering
6 I had retained them when I was at the Port of
7 Willapa to do work for us and got to know
8 several of the principals, or all of the
9 principals of the company, and they asked me to
10 come to work for them part-time when I retired
11 from the Port of Grays Harbor. The initial
12 idea was that I would work predominantly on
13 port projects. They did a lot of work for
14 ports.
15  Then when Katrina struck, Pacific
16 International Engineering was one of the firms
17 -- one of, I believe, three firms that Rimkus
18 Consulting Group contracted with to do field
19 work for them.
20  Q. Okay. And you're talking about field
21 engineering work, correct?
22  A. Yes.
23  Q. Wouldn't it be fair to say, Mr. Neva,
24 that you have had extensive practical
25 engineering experience over your 35 year

1 professional career?
2  MS. CUNNINGHAM:
3  Objection; vague.
4  MR. TRAHANT:
5  What is it?
6  MS. CUNNINGHAM:
7  Vague. When you say
8 "engineering experience," there's
9 all sorts of engineering
10 experiences out there.
11  THE WITNESS:
12  That's correct.
13 EXAMINATION BY MR. TRAHANT:
14  Q. Practical engineering experience in
15 terms of structures of -- of looking at and
16 examining buildings, have you had that -- has
17 that been part of your overall work experience
18 as an engineer?
19  A. Yes.
20  MR. TRAHANT:
21  At this time the plaintiffs would
22 tender Mr. Neva as an expert in the
23 field of civil engineering.
24  And plaintiff would ask that the
25 Court qualify him as an expert in that

1    field.
2  EXAMINATION BY MS. CUNNINGHAM:
3    Q.  We have some voir dire questions for
4  you, Mr. Neva.
5    A.  Sure.
6    MR. TRAHANT:
7      Can I ask something very quickly
8    before you do this, Meredith?
9      Are you going to voir dire an
10   expert witness whose name is on your
11   own retained engineer's expert report?
12   MS. CUNNINGHAM:
13     I am for the purposes that I
14   believe you're trying to use him,
15   yes.
16   MR. TRAHANT:
17     Okay.
18  EXAMINATION BY MS. CUNNINGHAM:
19   Q.  We've established you have a degree in
20  civil engineering?
21   A.  That's correct.
22   Q.  And that's an undergraduate degree?
23   A.  That's correct.
24   Q.  Do you have any advanced degrees
25  beyond that?

1    A.  No, I do not.
2   Q.  Okay.  Do you hold a professional
3  engineer's license in the State of Louisiana?
4    A.  No, I do not.
5   Q.  Do you hold a professional engineer's
6  license anywhere?
7    A.  No, I do not.
8   Q.  Have you ever held a professional
9  engineer's license anywhere?
10   A.  No. I have not.
11   Q.  You told Mr. Trahant that examination
12  of structures had been in your past history,
13  and I think I want to narrow it down a little
14  bit more.
15   A.  Certainly.
16   Q.  Hurricane Katrina, I understand, was
17  your first experience examining or viewing
18  properties that had been hit in a hurricane
19  zone on the Gulf Coast; is that right?
20   A.  That is correct.
21   Q.  Okay.  You had not had experience
22  before examining structures that had been
23  subject to storm surge as a result of a
24  hurricane?
25   A.  That is correct.

1   Q.  You had not had experience viewing
2  structures or properties subject to hurricane
3  force winds before; is that accurate or
4  hurricane winds, I suppose?
5   A.  You mean as far as determining damage
6  and --
7   Q.  Correct.
8   A.  -- assessing damage?
9     That's correct.
10   Q.  As far as structural failure
11  reconstruction, do you understand that?
12   A.  Uh-huh.
13   Q.  What's your experience in that?
14   A.  Well, I had -- I -- the work that I
15  was asked to do for Rimkus it was my first
16  experience in what they call forensic
17  engineering.
18   Q.  Okay.
19   A.  My prior experience with buildings was
20  more as a building inspector, building official
21  in the construction of buildings.
22   Q.  Okay.
23   A.  Rather than the repair of damaged
24  buildings.  You know I cannot say that -- that
25  I wasn't out on inspections for building

1  permits of damaged buildings.  You know, I
2  don't recall.  But for most part it was in new
3  construction --
4   Q.  So --
5   A.  -- and remodel.
6   Q.  -- am I correct in understanding that
7  your past experience, as far as structural
8  engineering would go, would be viewing
9  buildings as they are going up rather than
10  buildings as they have come down?
11   A.  That's correct.
12   Q.  Okay.  Do I understand correctly that
13  if you're not a licensed engineer in Louisiana
14  you cannot sign and seal reports here in this
15  state?
16   A.  I cannot put a stamp on them and
17  represent myself as a -- as professional
18  engineer on the report.
19   Q.  Have you ever testified as an expert
20  witness in court to express an opinion about a
21  building structure as it has come down?
22   A.  No.
23   Q.  Have you ever testified in other
24  proceedings, for example, administrative
25  proceedings, to proffer an expert opinion as to

<HR>

1  a building and its structure and the reasons it
2  came down?
3      A.  No.
4      Q.  Have you ever authored any
5  publications regarding failure reconstruction?
6      A.  No.
7      Q.  Have you ever made any presentations
8  regarding failure reconstruction?
9      A.  No.
10     Q.  Have you ever presented any seminars
11 regarding failure reconstruction?
12     A.  No.
13     Q.  Do you agree with me that failure
14 reconstruction is not your area of expertise?
15     A.  Yes.
16     MS. CUNNINGHAM:
17         Given Mr. Neva's testimony, we
18     object to him being offered as an
19     expert witness for several reasons.
20         One, is he was not listed as an
21     expert on the plaintiff's exhibit --
22     witness list.
23         Number two, we were not provided
24     Rule 26 information beyond the Rimkus
25     report on which you are.

1      THE WITNESS:
2         Uh-huh.
3      MS. CUNNINGHAM:
4         And to the extent he is here to
5      offer opinion testimony, beyond the
6      report that we all have and that's
7      been produced in this proceedings, we
8      would object to that tender.
9         We also object to his
10     qualifications; not as to what he did
11     for Rimkus but for him offering the
12     opinion that I believe he's being
13     offered to provide here under Daubert.
14         If port operations or building
15     inspections or, kind of, field work
16 and
17     surveying were at issue we wouldn't
18     contest any sort of qualifications of
19     Mr. Neva at all, but failure
20     reconstruction is not Mr. Neva's area
21     of expertise.
22         So that's our position on that.
23     I just needed to make that on
24     the record.
25     MR. TRAHANT:

1         Okay.
2  EXAMINATION BY MR. TRAHANT:
3      Q.  Well, in light of that, Mr. Neva, let
4  me ask you this:  Do you know the approximate
5  number of inspections you did for Rimkus
6  relative to Hurricane Katrina?
7      A.  I would guess about 125.
8      Q.  Okay.  And all of those were for
9  Rimkus Consulting Group, correct?
10     A.  That's correct.
11     Q.  And you understand in this case it was
12 Allstate, the company that Ms. Cunningham
13 represents, that retained your services through
14 Rimkus?
15     A.  That's correct.
16     Q.  And you billed $175 an hour, the same
17 as the professional engineer, Craig Rogers,
18 from Louisiana, correct?
19     A.  I have no idea what the --
20     Q.  Okay.
21     A.  -- what he -- the --
22     Q.  But you'd have no reason to dispute
23 that, --
24     A.  I just know --
25     Q.  -- correct?

1      A.  -- what they pay me.
2      MS. CUNNINGHAM:
3         You need to show him this
4      document.
5      MR. TRAHANT:
6         And I will, don't worry.
7  EXAMINATION BY MR. TRAHANT:
8      Q.  And obviously, Rimkus, on behalf of
9  Allstate, had enough confidence in your
10 qualifications to send you out and inspect
11 properties and gather critical information
12 because of your background in engineering,
13 correct?
14     MS. CUNNINGHAM:
15         Objection.  He can't speak as
16     part of Rimkus's thinking.  He
17     can discuss what his
18     understanding was and his role
19     was --
20     MR. TRAHANT:
21         And that's what I'm ask --
22     MS. CUNNINGHAM:
23         -- in his Rimkus process.
24     MR. TRAHANT:
25         And that's what I'm asking

1    him.
2    EXAMINATION BY MR. TRAHANT:
3    Q.  That was your understanding, correct?
4    A.  Yes.
5    Q.  Okay.  Certainly Rimkus didn't go out
6    and hire lawyers like me to go make field
7    inspections, correct?
8    A.  Correct.
9    Q.  And --
10   A.  Not to my knowledge.
11   Q.  Okay.  To your knowledge they hired
12   individuals with experience in engineering,
13   correct?
14   A.  Yes.
15   Q.  And Rimkus relied on you and Allstate
16   relied on Rimkus; that's your understanding,
17   correct?
18       MS. CUNNINGHAM:
19          Objection; vague.
20   EXAMINATION BY MR. TRAHANT:
21   Q.  In terms of the site inspection,
22   Rimkus relied on you and Tao Xiong, the other
23   individual who did the site inspection with
24   you, and we'll talk about him, and obviously
25   Allstate retained Rimkus, correct?

1        MS. CUNNINGHAM:
2           Objection; it's vague and
3        compound.
4        MR. TRAHANT:
5           Do you understand what I'm
6        asking you?
7        THE WITNESS:
8           Yes.  I would say Rimkus
9        relied on me, Tao, others to go
10       out and gather information so
11       that they could accurately
12       prepare a report.
13   EXAMINATION BY MR. TRAHANT:
14   Q.  Okay.  And did you ever have the
15   impression before today that Allstate was going
16   to attempt to assail your qualifications with
17   respect to the work that you did?
18       MS. CUNNINGHAM:
19          Objection; that's number one,
20       irrelevant; number two, that's
21       not true.  We're not assailing
22       his qualifications as to the work
23       he did at all; and number three,
24       it's leading and it's --
25       MR. TRAHANT:

1        He's an --
2        MS. CUNNINGHAM:
3           -- and it's suggesting
4        something --
5        MR. TRAHANT:
6        He's an --
7        MS. CUNNINGHAM:
8           -- that I'm not doing.
9        MR. TRAHANT:
10          He's an expert, Meredith,
11       and I can lead him all around the
12       block if I feel like it.
13       MS. CUNNINGHAM:
14          I don't think he's an expert
15       in what you're trying to make him
16       an expert in.
17   EXAMINATION BY MR. TRAHANT:
18   Q.  In any event, your impression,
19   Mr. Neva, as you sit here as a witness, does it
20   surprise you at all that Allstate is going to
21   object to you being qualified as an expert in
22   field of civil engineering?
23       MS. CUNNINGHAM:
24          Objection; --
25       THE WITNESS:

1        No.
2        MS. CUNNINGHAM:
3           -- irrelevant.
4        MR. TRAHANT:
5           Okay.
6        THE WITNESS:
7           No, it doesn't.
8    EXAMINATION BY MR. TRAHANT:
9    Q.  And why doesn't it?
10   A.  Well, because I'm --
11       MS. CUNNINGHAM:
12          Objection; this is all
13       irrelevant.
14       MR. TRAHANT:
15          Okay.  And I'll withdraw
16       that.
17   EXAMINATION BY MR. TRAHANT:
18   Q.  You understand, Mr. Neva, that in your
19   capacity as a subcontracted engineer through
20   Rimkus that you were to give some opinions on
21   things?
22   A.  Correct.
23   Q.  Okay.  So that we understand, and the
24   judge who reviews this understands, and the
25   jury understands, you knew that you were being

<HR>

1   asked to give a preliminary opinion on these
2   matters, correct?
3       A.  Correct.
4       Q.  Now, let's -- let's get into the meat
5   of it, Mr. Neva.  You have -- you've traveled
6   quite a long way to be with us here today,
7   correct?
8       A.  Uh-huh.
9       Q.  And just so that the jury understands,
10  you're testifying by video because you are
11  scheduled to be out of the country when this
12  trial occurs on the week of April 9th, correct?
13      A.  Well, not out of country.  I'm
14  scheduled to be at a Pacific Coast Congress of
15  Port Masters and Port Managers Annual Meeting
16  in Washington State.
17      Q.  Okay.  All right.  So out of town?
18      A.  The same -- it's the San Juan Islands.
19  It's -- it may sound like it's out of the
20  country but it's not really.
21      Q.  Okay.  I --
22      A.  It's close to Canada.
23      Q.  I got you.  All right.  And, Mr. Neva,
24  you've graciously appeared in my office in
25  Metairie, Louisiana today without being served

1   with a subpoena, correct?
2       A.  That's correct.
3       Q.  Okay.  You've explained, Mr. Neva, how
4   you came to be in the New Orleans area
5   subsequent to Hurricane Katrina, and I'd like
6   you to explain to the jury how you came to
7   inspect the Weiss Property located at 13
8   Treasure Isle on behalf of Allstate Insurance
9   Company?
10      A.  I received an assignment from Rimkus,
11  several assignments.  This was our first -- my
12  first trip out here to do Hurricane Katrina
13  work for Rimkus and Pacific International
14  Engineering.
15          We received a list of various
16  assignments and that was one of them.  The
17  Weiss property was one of them.  There was some
18  confusion.  They had the wrong address.  They
19  had the Weisses' house that was next door, I
20  think it was like 14 Treasure Isle, instead of
21  13 Treasure Isle or vice-a-versa.
22          But when I went out there and I called
23  the Weisses to make arrangements and asked if
24  they wanted to be out there during the
25  inspection, we always like -- prefer to have

1   the property owner out there, the insured, so
2   that they can fill-in information, like what
3   was here, you know, how was it constructed,
4   what type of roof did it have, what type of
5   siding did it have.
6           And, so, anyhow, when Tao and I got to
7   the property Mr. And Mrs. Weiss were there and
8   had they not been there, assuming we could have
9   even found the property, we would have
10  inspected the wrong -- the one next door
11  because that's what the assignment was.  And
12  they assured me that, no, it was house, the big
13  house that they wanted -- so what we ended up
14  doing is doing both.  We inspected both
15  figuring that that's probably what we'll end up
16  getting an order for and if not that we would
17  just donate our time for the wrong one.
18      Q.  Okay.
19      A.  But -- so that's how -- in every case
20  -- every -- I made five trips out here over
21  about nine months.  Generally, two to three
22  week at a time.  And you -- generally you'll
23  get a half a dozen assignments before you ever
24  come out, maybe more, and then as you get out
25  here and you start making all your contacts and

1   make -- setting up your appointments and
2   everything and you start doing the inspections
3   then, you know, I would contact the Rimkus
4   office and ask for more assignments.
5       Q.  Okay.
6       A.  You know, try to say ahead of it so we
7   don't have time.  We would try to maximize our
8   time while we're out here.
9       Q.  And just so that the record's clear
10  and the jury understands, Mr. Neva, you knew at
11  that time that the client you were working for
12  was actually Allstate Insurance Company and not
13  Dr. and Mrs. Weiss, correct?
14      A.  Well, yes.  The -- the -- the form,
15  the standard form that they have for an
16  assignment it lists who Rimkus' client is.
17      Q.  Okay.  And that was Allstate, correct?
18      A.  I believe it was.
19      Q.  Okay.
20      A.  I don't have that in front of me and
21  when -- that was a year-and-a-half ago.
22      Q.  And you're familiar with the
23  gentleman, Tao Xiong; am I pronouncing that --
24      A.  Uh-huh.
25      Q.  -- correctly?

<HR>

1    And how did you know Mr. Xiong?
2    A. I actually met him on that assignment
3    or not necessarily the Weiss assignment but on
4    that trip out here. He's a licensed engineer
5    with Pacific International Engineering.
6    And when I initially came out on that
7    trip, like around the 30th of October or
8    something like that, seems like it was right
9    towards the end of October when we flew out,
10    accompanying me was Albert Liou who is another
11    engineer with Pacific International
12    Engineering, and his last name is spelled
13    L-i-o-u, and he's one of the principals at
14    P-I-E.
15    He and I flew out together. He was
16    out here for four or five days. We did various
17    inspections together, we worked together, and
18    then he had to go back to Edmonds. So I worked
19    by myself for a couple of days, I believe, and
20    then received word that Tao was coming out and
21    I was to pick him up at the airport. And so
22    then for the rest of that trip Tao and I went
23    out on inspections together.
24    Q. Okay.
25    A. We felt that two eyes, two sets of

1    eyes looking at a structure or a piece of
2    property are better than one and people look at
3    things differently. And Tao's background is
4    different than my background. So we're going
5    to definitely look at things differently.
6    Q. Okay. And specifically on the Weiss
7    claim you and Tao worked as a team on that --
8    A. That's --
9    Q. -- particular --
10    A. -- correct.
11    Q. -- job?
12    A. That's correct.
13    Q. Okay.
14    A. That's correct.
15    Q. And as we sit here, Mr. Neva, you no
16    longer do any work for Pacific International
17    Engineering, correct?
18    A. Other than this today.
19    Q. Okay. And do you understand this to
20    be a job for Pacific International?
21    A. Well, yes. They asked that my
22    billings go through them at any rate.
23    Q. Okay. And certainly you -- you are
24    not on assignment or have -- nor have you done
25    any work for Rimkus Consulting Group, let's

1    say, in the last five or six months, correct?
2    A. I came back from my last trip, I
3    believe it was, June 15th of '06, and that's --
4    once I finished up the reports from that trip
5    that's the last work that I did for Rimkus.
6    And the only work I've done since then, even
7    for Pacific International Engineering, was
8    attend some meetings and conferences on their
9    behalf.
10    Q. Okay. So with regard to your
11    testimony you have no concern as it pertains to
12    your employment presently, correct?
13    A. No.
14    Q. Okay. And your only interest here is
15    to tell the truth, correct?
16    A. That's correct.
17    Q. Okay. I would like for you to take a
18    look in the big binder if you would, Mr. Neva.
19    A. I see why you call it the big binder.
20    Q. It's the big binder. And specifically
21    the pages are Bates stamped numbered at the
22    bottom on the right-hand side; do you see that?
23    A. Uh-huh. Where it says Allstate Weiss
24    07?
25    Q. Yes, sir.

1    A. Uh-huh.
2    Q. And if you would turn to page 57,
3    please?
4    A. (Witness complies.)
5    MS. CUNNINGHAM:
6    Can I come look over your
7    shoulder? I didn't bring my huge
8    binder.
9    MR. TRAHANT:
10    Sure.
11    EXAMINATION BY MR. TRAHANT:
12    Q. And specifically, Mr. Neva, I'd like
13    you to take a look at an entry by an adjuster
14    named Michael D. Wells on October 8th of 2005.
15    Would that have been -- that date about a month
16    before you and Tao Xiong did your site
17    inspection?
18    A. Yes.
19    Q. Okay. And it's a general assessment
20    by Mr. Wells of what he found when he went to
21    the property and specifically I'd like you to
22    refer to the part where the line begins with
23    "appears."
24    A. Uh-huh.
25    Q. Okay. And it says --

```
 1      MS. CUNNINGHAM:
 2         Could I object for the record.
 3      This isn't a (sic) document that
 4      I don't think Mr. Neva's ever
 5      seen before.
 6      MR. TRAHANT:
 7         That's the point of it.
 8      EXAMINATION BY MR. TRAHANT:
 9      Q.  It says, and I'll quote, Mr. Neva,
10   "Appears wind may have destroyed structure and
11   floodwater washed it away."
12         Before you went out to this job did
13   Allstate make you aware of the adjuster's
14   position relative to the Weiss property?
15      A.  I don't believe so. I don't recall
16   for sure. They're -- out of the 125
17   inspections that I did once in a while I would
18   be notified of an adjuster's position prior to
19   going out. More often than not I was not.
20      Q.  Okay. So it -- it's probably pretty
21   fair to say, relying on your memory, you did
22   not know --
23      A.  Yes.
24      Q.  -- that this was Allstate's position
25   relative to the Weiss claim?
```

```
 1      MS. CUNNINGHAM:
 2         Objection; that's -- it's
 3      irrelevant and there's no
 4      foundation for that in the record
 5      and there won't be.
 6      MR. TRAHANT:
 7         What you just read is --
 8      MS. CUNNINGHAM:
 9         Same objection.
10      MR. TRAHANT:
11         Let me finish.
12      MS. CUNNINGHAM:
13         I will.
14      EXAMINATION BY MR. TRAHANT:
15      Q.  What you just read, as you sit here,
16   you have no recollection of Mr. Wells or
17   anybody from Allstate telling you that they had
18   documented the position which you just read,
19   correct?
20      MS. CUNNINGHAM:
21         Same objection.
22      MR. TRAHANT:
23         You can answer.
24      THE WITNESS:
25         That's correct.
```

```
 1      MR. TRAHANT:
 2         Okay.
 3      THE WITNESS:
 4         Yeah.
 5      EXAMINATION BY MR. TRAHANT:
 6      Q.  Okay. And if you turn the book, the
 7   big binder, to page 60 and look three blocks
 8   down into the end of the second line of that
 9   paragraph it says, and I quote -- this is an
10   entry from someone named Tina Thompson on
11   October 16, 2005 about three weeks before you
12   and Mr. Xiong went to the property.
13         And it says, "Discuss this claim with
14   the structural adjuster. He also agreed that
15   the home was a total loss due to wind. This
16   was a three story home. The first story was
17   ground floor and parking garage and this floor
18   was destroyed by flood. The top two stories
19   were destroyed by wind per structure adjuster."
20         Today is the first time you've seen
21   that, correct?
22      A.  Yes.
23      Q.  And today is the first time that you
24   knew that that was documented in Allstate's
25   claims file prior to you and Mr. Xiong going
```

```
 1   out, correct?
 2      A.  Correct.
 3      Q.  Okay. Now, if you would, Mr. Neva,
 4   walk the jury through what you and Mr. Xiong
 5   did the day you went out to the Weiss property.
 6      A.  What we did?
 7      Q.  Yes, sir.
 8      A.  Well, first thing, when we got to the
 9   property is introduce ourself to Mr. and Mrs.
10   Weiss and my recollection is that Mr. Weiss,
11   after introducing himself, the first thing that
12   I recall him saying is: What does it look like
13   to you?
14      Q.  Okay.
15      A.  And I said that it looks like a
16   tornado hit it to me.
17      Q.  Okay.
18      A.  And the reason that I said that off
19   the top of much my head was that because the
20   concrete posts that had supported the structure
21   were lying in every direction rather than in a
22   general direction.
23         And so then, you know, I gathered
24   information from them. They showed me photos
25   of what the property looked like prior to the
```

1  hurricane so that I could — had the
2  information on -- on the, you know, the house;
3  what had been there.
4       I took a lot of photos of, you know,
5  what was at the site itself as far as on the
6  slab and around the edges of the slab and then
7  the trees in the vicinity. And Tao, I believe,
8  probably took the notes while I was taking the
9  photos and talking with Mrs. and Mrs. Weiss.
10      Q. Okay. And we're going to talk a
11 little bit more about the inspection, but at
12 the conclusion when you and Tao left the
13 property you had expressed to Dr. and
14 Mrs. Weiss that it was your belief that it was
15 a tornado or a high wind event that did the
16 majority of the structure -- the damage to the
17 structure of this house, correct?
18      MS. CUNNINGHAM:
19         Objection; leading.
20      MR. TRAHANT:
21         You can answer.
22      THE WITNESS:
23         I believe that I -- that I
24      said that -- that it looked like
25      tornado --

1  EXAMINATION BY MR. TRAHANT:
2       Q. Okay. And --
3       A. -- at the time when I left the
4  property.
5       Q. Sure. And while you were out there
6  you had an opportunity to observe other
7  structures --
8       A. Uh-huh.
9       Q. -- on Treasure Isle --
10      A. Uh-huh.
11      Q. -- that were elevated and still
12 standing, correct?
13      A. That is correct.
14      Q. Okay. And so as the two individuals
15 who actually went out to the property both you
16 and Mr. Xiong were in agreement when you left
17 the property that day that this was more likely
18 a wind event that primarily destroyed this
19 house, --
20      MS. CUNNINGHAM:
21         Objection; --
22      MR. TRAHANT;
23         -- correct?
24      MS. CUNNINGHAM:
25         -- leading.

1  MR. TRAHANT:
2       You can answer it.
3  THE WITNESS:
4       Yes.
5  EXAMINATION BY MR. TRAHANT:
6       Q. I was produced yesterday, Mr. Neva, a
7  collection of documents from Rimkus Consulting
8  Group and I'd like to get you to take a look
9  these.
10      MR. TRAHANT:
11         Go off the record for just a
12      second.
13 (Whereupon a break in proceedings was held.)
14 EXAMINATION BY MR. TRAHANT:
15      Q. All right. We went off the record,
16 Mr. Neva, and I presented you with some
17 documents that I received pursuant to a
18 subpoena to Rimkus Consulting Group and you
19 identified the second -- or the page that is on
20 the top of the stack that you have as the
21 second page of your assignment sheet, correct?
22      A. That's correct.
23      Q. And you identified about halfway down
24 the handwriting as being that of Tao Xiong,
25 correct?

1       A. That's correct.
2       Q. And Tao actually noted in there with a
3  question mark by it "small tornado," correct?
4       MS. CUNNINGHAM:
5          Objection. These aren't his
6       notes, so the fact that that's
7       noted is fine, but to the extent
8       anything goes beyond that --
9       MR. TRAHANT:
10         Do you know who --
11      MS. CUNNINGHAM:
12         -- Mr. Neva shouldn't be
13      opining as to what Mr. Xiong
14      meant.
15      MR. TRAHANT:
16         I'll break it down.
17 EXAMINATION BY MR. TRAHANT:
18      Q. Mr. Xiong wrote "small tornado,"
19 correct?
20      MS. CUNNINGHAM:
21         And for the record, I think it
22      says "small tornado question
23      mark."
24      MR. TRAHANT:
25         I already said that.

1    THE WITNESS:
2      Yes, he has in parenthesis,
3  "small tornado question mark."
4  EXAMINATION BY MR. TRAHANT:
5    Q. And that's consistent with the
6  discussions that you had with Tao, correct?
7    A. MS. CUNNINGHAM:
8      Objection; vague.
9  EXAMINATION BY MR. TRAHANT:
10    Q. Regarding what could potentially have
11  been what you likely thought was the origin of
12  the disappearance of the Weiss house, correct?
13    A. I don't really recall what discussions
14  I may or may have — may or may not have had
15  with Tao at the time. I only recall that we
16  agreed that it looked like it -- looked like a
17  tornado hit.
18    Q. And Tao, I think you said, is a
19  professional engineer, licensed, correct?
20    A. In the State of Washington, yeah. He
21  may be in Louisiana now, too, but I don't know.
22  Cause we got a lot of our engineers licensed in
23  Louisiana as well, as it looked like this was
24  going to be ongoing work for us.
25    Q. Okay. And you referred earlier to

1  having two sets of eyes to look at everything?
2    A. Correct.
3    Q. Is it fair to say that you and Tao
4  were in agreement when you left the property
5  that either high winds or a tornado damaged the
6  structure and then the storm surge carried the
7  rest of it away?
8    MS. CUNNINGHAM:
9      Objection; leading.
10    MR. TRAHANT:
11      You can answer.
12    THE WITNESS:
13      That's correct.
14  EXAMINATION BY MR. TRAHANT:
15    Q. And you knew, Mr. Neva, that the peak
16  intensity or the highest velocity winds came
17  long before the peak of the storm surge,
18  correct?
19    MS. CUNNINGHAM:
20      Objection; lack of foundation.
21    THE WITNESS:
22      Well, what do you call
23  "long"?
24      It came before, according to
25    the information that we had from

1    CompuWeather.
2  EXAMINATION BY MR. TRAHANT:
3    Q. Sure. The peak intensity winds --
4    A. Yes.
5    Q. -- would have come some hours before
6  the --
7    A. Correct.
8    Q. -- surge?
9    A. (No response.)
10    Q. Okay. And during that period of time
11  you were doing several jobs for Rimkus
12  Consulting Group, correct?
13    A. Several inspections?
14    Q. Yes.
15    A. Yes. Uh-huh.
16    Q. Okay. And over the course of the next
17  few weeks on the Weiss claim you and Mr. Xiong
18  actually prepared a report relative your --
19  relative to your findings, correct?
20    A. I prepared a report.
21    Q. Okay. And I want to show you,
22  Mr. Neva, it should be in the documents that
23  you have in front of you, billing records,
24  produced by Rimkus Engineering and this would
25  reflect that --

1    MS. CUNNINGHAM:
2      Wait. Let me look there real
3  quick.
4    MR. TRAHANT:
5      Okay.
6    MS. CUNNINGHAM:
7      What number it is.
8    THE WITNESS:
9      Uh-huh.
10  EXAMINATION BY MR. TRAHANT:
11    Q. This would reflect that Tao had some
12  input and you actually wrote --
13    A. Uh-huh.
14    Q. -- wrote the draft report and you
15  finalized your report, correct?
16    A. Yes, my draft -- I always called these
17  a draft or a preliminary report is what I
18  called them.
19    Q. Okay.
20    A. Yes. And Tao's involvement, as you
21  see on the report, is a half an hour, I
22  believe. And that would have been, you know,
23  me maybe calling him up or say -- trying to
24  interpret his handwriting, you know, and or --
25  or also it could have been asking him -- maybe

1  I come up to a place in the report where I
2  wanted to corroborate what I had seen out there
3  so I'd get on the phone and call him.
4      Q.  Okay.
5      A.  But I wrote the report probably from
6  my -- my house, my home, down on Long Beach
7  Peninsula, whereas Tao was up in Edmonds.
8      Q.  Okay.
9      A.  Which is like five hours away.
10     Q.  Okay.  And you would have used your
11 own computer to draft that report?
12     A.  Pacific International Engineering's
13 lap top.
14     Q.  And that report, when I say "that
15 report," the report that indicates you
16 finalized or which I understand --
17     A.  Uh-huh.
18     Q.  -- you testified was an initial draft
19 report would have been completed on or about
20 November 29th of '05, correct?
21     A.  Well, -- yes.
22     Q.  Okay.  It wasn't a trick question.
23         And it's fair to say that it was your
24 understanding that either yourself or Tao sent
25 this document or the document was ultimately

1  sent in to Rimkus Consulting Group?
2      A.  Correct.  I -- I sent the document by
3  e-mail, more than likely, unless I
4  hand-delivered it to Pacific International
5  Engineering, Pam, at Pacific International, and
6  then the procedure was that at -- once a week
7  she compiled all of these preliminary reports
8  from the various engineers that had been out
9  there and sent them off to Rimkus' office down
10 the street here --
11     Q.  Okay.
12     A.  -- in Metairie.
13     Q.  In Metairie?
14     A.  (No response.)
15     Q.  And you've had an opportunity --
16     A.  Of course it wasn't Metairie at that
17 time.  I don't think they were back in their
18 office, but --
19     Q.  Okay.
20     A.  -- at any rate.
21     Q.  You've had an opportunity to review
22 the final report stamped by Craig Rogers in
23 this case, correct?
24     A.  Yes, I have.
25     Q.  And the report that you prepared was

1  in the same format?
2      A.  Yes, it was.
3      Q.  Okay.  So, as you sit here it would be
4  your position, Mr. Neva, that somewhere in its
5  system Rimkus should absolutely have a copy of
6  the report that you finalized on November 29th
7  of '05?
8      A.  Correct.
9      Q.  Okay.  Let's talk about what occurs
10 after you write your initial report.
11     A.  Uh-huh.
12     Q.  And I will represent to you that I
13 don't believe I've been produced a copy of that
14 initial report.
15     A.  Uh-huh.
16     Q.  Did that initial report contain your
17 opinion at that time that you believed that it
18 was a tornado strike that hit the Weiss
19 property?
20     A.  Yes.
21     Q.  Okay.  And, further, did it reference
22 certain things, trees, the manner in which the
23 pilings fell, as a conclusion?
24     A.  Yeah.  I don't -- it would not have
25 referenced trees, I don't believe, because I

1  did not -- I didn't see trees that had evidence
2  of tornado strike.  It referenced the fact that
3  the concrete piers were leaning in all
4  different directions as my reason for coming to
5  that conclusion.
6      Q.  Okay.  And are you aware of whether
7  that observation, which factored into your
8  conclusion, was ever included in the final
9  Rimkus report stamped by Mr. Rogers?
10     A.  No.  I looked at the final report
11 about a week ago.  I don't recall seeing that
12 mentioned but I wasn't looking for it.
13     Q.  Okay.  And we'll let you take a look
14 at it --
15     A.  Uh-huh.
16     Q.  -- a little bit later.
17         So, explain to the jury, if you would,
18 Mr. Neva, what the Rimkus peer review process
19 is beyond your preparation of a report?
20     A.  As far as I know, I send the report
21 off.  I could get a call in a few weeks, a few
22 months, or it could be longer, but normally
23 it's within a few months.  I'll get a call
24 usually from whatever engineer is going to be
25 putting their stamp on the final report and

<HR>

1  writing the final report.
2      And oftentimes it'll be just to get
3  some clarification to -- to want to know do I
4  have more photos that I can send, but
5  oftentimes it's -- well, sometimes, as in this
6  one, it's also to discuss the conclusion and to
7  try come on -- on -- in agreement.
8      And I was -- I am under the
9  understanding that if -- if the engineer that
10 does the field work and the engineer that
11 writes the final report if they are
12 diametrically opposed in their agreements or
13 can't come to -- to come to agreement on their
14 conclusion, I mean, that they will send out a
15 new field person and have a new engineer review
16 it beca -- that -- the -- the policy is that
17 they do eventually come to agreement or you get
18 another team in.
19     Q.  Okay.  And the individual who
20 ultimately stamped --
21     A.  Uh-huh.
22     Q.  -- the report for the Weiss property,
23 No. 13 Treasure Isle, was a Louisiana
24 engineer --
25     A.  Uh-huh.

1      Q.  -- named Craig Rogers, --
2      A.  Uh-huh.
3      Q.  -- correct?
4      A.  Uh-huh.
5      Q.  Okay.  And is it fair to say, that to
6  your knowledge, Craig Rogers, before preparing
7  the final report that he stamped and sealed,
8  had never stepped foot on the Weiss property?
9      A.  I don't know if he did or not.  I
10 would a -- he probably did not but I -- I don't
11 recall.
12     Q.  Okay.
13     A.  But my understanding would have been
14 that he -- that's what they asked us to do, you
15 know.
16     Q.  Okay.
17     A.  If he thought that there that was
18 evidence out there that I didn't pick up on or
19 something like that then most likely either he
20 would go out or they would send somebody else
21 out to -- to look for additional evidence.
22     Q.  Okay.  And --
23     A.  To support either what -- a conclusion
24 that I had or a conclusion that he was drawing.
25     Q.  Okay.  I'd like you to take a look at

1  the Rimkus invoice, Mr. Neva, --
2      A.  Uh-huh.
3      Q.  -- and tell me when Craig Rogers first
4  bills any time on the Weiss file.
5      A.  Just this page?
6      Q.  Yes, sir.
7      MS. CUNNINGHAM:
8          And this is just on this invoice
9      since we know there's another one.
10     THE WITNESS:
11         This says January 19th of '06,
12     two hours, peer review for clarity and
13     technical accuracy.
14 EXAMINATION BY MR. TRAHANT:
15     Q.  Okay.  And if that is the extent of
16 what Mr. Rogers did, which is reflected on the
17 Rimkus invoice before the report came out on
18 February 1st of '06, it indicates that he did
19 not visit that property, correct?
20     MS. CUNNINGHAM:
21         Objection; leading and lack of
22     foundation.
23     MR. TRAHANT:
24         You can answer.
25     THE WITNESS:

1          Well, I mean, if he did go
2      out they didn't bill for it or
3      they didn't separate it out on a
4      bill.
5  EXAMINATION BY MR. TRAHANT:
6      Q.  That would be highly uncommon with
7  Rimkus, correct?
8      A.  Oh, I don't know.
9      Q.  Okay.  But you --
10     A.  I don't have -- I don't have a
11 longstanding relationship with Rimkus, you
12 know, so, but I would -- I can only assume that
13 they would have billed for that and it would be
14 listed separately, just as it is for our time.
15     Q.  So I guess the fairer question would
16 be, you have no knowledge that Mr. Rogers ever
17 stepped foot on this property before preparing
18 his report; isn't that correct?
19     A.  That's correct.
20     Q.  Okay.  And ultimately Mr. Rogers
21 convinced you to change the conclusions of the
22 report, correct?
23     MS. CUNNINGHAM:
24         Objection.  It's leading and
25     suggests things not in the

<HR>

1     record.
2     THE WITNESS:
3         What happened was, I got a
4     call from Craig Rogers when he
5     began to write the report and he
6     read over my observations. He
7     looked at the photos. I don't
8     know if he had -- he probably had
9     a copy of this, too. I -- but I
10    don't know that. I don't know
11    what all they send from PIE up to
12    -- up to Rimkus, you know, for
13    the background support and stuff.
14        But, at any rate, he called
15    me and said he was working on the
16    Weiss report and --
17    EXAMINATION BY MR. TRAHANT:
18    Q.  I think -- I don't want to cut you off
19    and I apologize for doing so.
20    A.  No. No.
21    Q.  But I think we're probably going into
22    hearsay territory now. So if you could explain
23    your answer without necessarily talking
24    about --
25    A.  Okay.

1     Q.  -- what he told you that would be
2     fine.
3     A.  He convinced me that it probably was
4     due to storm surge rather than a tornado. He
5     did not see tornado evidence.
6     Q.  Okay. And he actually changed those
7     conclusions himself because he prepared the
8     final report, correct?
9     A.  Yes. My job was to gather
10    information.
11    Q.  Okay.
12    A.  His job is to write the report and
13    stamp it.
14    Q.  And from the time you visited that
15    property on November 8th of 2005 and the time
16    he stamped that report on February 1st of 2006,
17    which is about a three-month period, --
18    A.  Uh-huh.
19    Q.  -- you had some conversations with
20    Mrs. Weiss, did you not?
21    A.  Yes.
22    Q.  Okay. Do you recall ever saying to
23    her, Mr. Neva, something to the effect of, It's
24    out of my hands and I don't have the final say?
25    A.  I recall saying that it's been -- my

1     recollection is that she -- she called to find
2     out what's the status of the report and -- now,
3     I could be wrong on this, too, but that's my
4     recollection.
5         Cause I would quite often get phone
6     calls from insureds wanting to know what's the
7     status; what's the status? And I would say
8     that I have done my portion of it. I have done
9     the inspection. I have written my preliminary,
10    sent my -- sent the information in and that
11    it's out of my hands, you know. I mean, I -- I
12    have no control over it from then on.
13        As far as time frame, I did -- I was
14    not aware of how long it takes Rimkus to then
15    do the final report. How long it takes before
16    it goes to Allstate or whoever the customer is,
17    you know, and even now I don't know, you know.
18    Cause I -- I'm no longer involved.
19        Other than if I get a call from the
20    engineer, you know, as he's doing the report,
21    wanting further information or wanting to
22    discuss something I had in the observations or
23    something I had in the conclusion, or -- but,
24    as far as stating that the conclusion was out
25    of my hands; is that what you said, something

1     like that?
2     Q.  About the final decision.
3     A.  Yeah. I don't recall saying that. I
4     may have. But, you know, I -- the field people
5     do have involvement in coming to the final
6     decision, like I had mentioned before. You
7     know we may -- we may initially have a
8     different conclusion than what is on the final
9     report, but that's if it -- if our initial
10    report says something different than the final
11    report, there's been conversation between the
12    engineer and the person that did the field work
13    to come to that final conclusion.
14    Q.  Okay. And three months, under these
15    circumstances where these people have lost
16    their home and everything in it, is a long time
17    to wait for an engineering report, isn't it?
18    MS. CUNNINGHAM:
19        Objection. Calls for
20    speculation.
21    MR. TRAHANT:
22        It's a long --
23    MS. CUNNINGHAM:
24        It's leading as well.
25    MR. TRAHANT:

1    It's a long time --
2    MS. CUNNINGHAM:
3        And it's not relative to the
4    Katrina period.
5  EXAMINATION BY MR. TRAHANT:
6    Q.  Is it a long time?
7    A.  Well, if you're the homeowner it sure
8  is.
9    Q.  Sure.
10   A.  But, you know, they had hundreds and
11 hundreds of these assignments, I would assume,
12 from various insurance companies and there was
13 quite a backload and I would imagine people had
14 to wait a long time for a lot of things.
15       And I couldn't help but empathize with
16 all the insureds and that's why I'd made every
17 effort to get my portion done as quickly as
18 possible.
19   Q.  Right.
20   A.  And after that first trip out here, by
21 the second trip even, I think, I was writing
22 reports in my hotel room at night.
23   Q.  Sure.
24   A.  And I know one of the trips, by the
25 time I left to go back, I had all my reports

1  done.  Because for two reasons, one was just to
2  expedite the process, speed it up, but also if
3  I'd get down to -- to the -- the part of
4  writing the report and I think that I may have
5  missed  something or this photo really didn't
6  capture what I -- what I saw, I can run back
7  out there and -- and gather more information.
8    Q.  Okay.  And you had your report written
9  within 20 days of the site inspection, correct?
10   A.  I would believe -- I would imagine I
11 did.
12   Q.  I want you to take a look for me,
13 Mr. Neva, in the big binder.
14   A.  (Witness complies.)
15   Q.  And if you would flip, please, page
16 286, and flip through, please, to page 300 and
17 tell me if that represents the Rimkus report or
18 what you know to be the final Rimkus report
19 sealed by Mr. Rogers?
20   A.  Well, I --
21   MS. CUNNINGHAM:
22       Let me ask you, --
23   THE WITNESS:
24       I don't --
25   MS. CUNNINGHAM:

1    -- could I look at the
2    document, Rick.  Just let me --
3    THE WITNESS:
4        Having never -- normally
5    what -- if an engineer sends me
6    back a copy of the final report
7    which more often than not they do
8    not and I don't rem -- recall if
9    they -- if Roger -- Craig Rogers
10   did or not.  But, normally, what
11   I get stops at the photos there.
12 EXAMINATION BY MR. TRAHANT:
13   Q.  Okay.  So you would have gotten --
14   A.  Which is basically -- it's the same
15 thing that I send to them.
16   Q.  Right.  It's the first four pages; is
17 that right?
18   A.  Something like that, yeah.  Well, --
19 one, two, three, four and with the attached
20 photos.
21   Q.  Okay.  Now, earlier when we were
22 talking about your qualifications
23 Ms. Cunningham, counsel for Allstate, said and
24 I -- I wrote this down in quotes, "That you
25 cannot sign and seal a report."

1    If you look at page 289, Mr. Neva, --
2    A.  Uh-huh.
3    Q.  -- somebody signed this report for
4  you, correct?
5    A.  Uh-huh.
6    Q.  Do you know who did that?
7    A.  No.
8    Q.  Have you ever seen that before?
9    A.  No.
10   Q.  As you sit here today, Mr. Neva, you
11 don't know who signed that on your behalf,
12 correct?
13   A.  That's correct.
14   Q.  Because as Ms. Cunningham pointed out
15 you're not authorized in the State of Louisiana
16 to sign an engineering report; is that --
17   MS. CUNNINGHAM:
18       Objection.
19   MR. TRAHANT:
20       -- right?
21   MS. CUNNINGHAM:
22       That's not what I said.  I
23   said he couldn't sign and seal
24   the report which he hasn't done
25   in this page right here.  And

**Page 58**

1 this is actually Bates No.
2 A-L-S-T-W-E-I-S 289. You'll see
3 there's no seal on it from
4 Mr. Neva.
5 EXAMINATION BY MR. TRAHANT:
6 Q. Did you give anybody specific
7 permission to affix your signature to that
8 report, Mr. Neva?
9 A. I don't recall anybody ever asking.
10 I put my name on it.
11 Q. Okay.
12 A. So I mean I -- I do not have a problem
13 with my signature being there, but -- you know
14 -- I know -- I was aware that my name would be
15 on the final report as a consultant.
16 Q. And to be clear, --
17 A. Uh-huh.
18 Q. -- this report essentially concludes
19 just the opposite of what your -- your and
20 Tao's conclusions were when you left the
21 property on November 8th of 2005, correct?
22 MS. CUNNINGHAM:
23 Objection; leading.
24 THE WITNESS:
25 Well, it's -- the conclusion

**Page 59**

1 changed dramatically. I was
2 aware of that when the final --
3 that the final report, you know,
4 said storm surge is what
5 collapsed the building.
6 EXAMINATION BY MR. TRAHANT:
7 Q. From an engineering perspective,
8 Mr. Neva, don't you think it's important for
9 the engineer to actually inspect the thing he's
10 giving an opinion on?
11 MS. CUNNINGHAM:
12 Objection; vague.
13 MR. TRAHANT:
14 Do you understand what I'm
15 saying?
16 THE WITNESS:
17 Yeah, I understand. Is it
18 valuable? Yes, it's valuable.
19 Is it common? An engineering
20 firm generally has an array of
21 types of people that do different
22 works just as a law firm does.
23 EXAMINATION BY MR. TRAHANT:
24 Q. Okay. But I want you to answer the
25 question from your perspective.

**Page 60**

1 A. From my perspective?
2 Q. In engineering if you're looking at
3 something you want to -- you want to go out
4 there and actually touch it and see it and feel
5 it, correct?
6 MS. CUNNINGHAM:
7 Let me object. That is vague.
8 And we're talking about engineering in
9 the --
10 THE WITNESS:
11 Yeah.
12 MS. CUNNINGHAM:
13 -- broadest sense of the word. I
14 mean --
15 THE WITNESS:
16 I -- I can't really answer that.
17 It depends on the situation what the
18 -- what's at issue and who my
19 alternative is to take a look at it
20 and --
21 MR. TRAHANT:
22 Okay.
23 THE WITNESS:
24 -- touch and feel, and whether I
25 really trust their judgment.

**Page 61**

1 EXAMINATION BY MR. TRAHANT:
2 Q. Well, what I'm asking you is you
3 testified earlier that two sets of eyes is
4 better.
5 A. Uh-huh.
6 Q. And those sets of eyes were on this --
7 A. Uh-huh.
8 Q. -- property, correct?
9 A. Uh-huh.
10 Q. Wouldn't you be more comfortable in a
11 situation like this giving an opinion if you
12 actually visited the property?
13 A. Certainly.
14 Q. Okay. Because more information is
15 always better than less, correct?
16 A. Certainly.
17 MR. TRAHANT:
18 I think we're probably at a
19 breaking point.
20 (Whereupon a break in proceedings was held.)
21 EXAMINATION BY MR. TRAHANT:
22 Q. Mr. Neva, in the approximately 125
23 Hurricane Katrina inspections that you did you
24 stepped foot on every site, did you not?
25 A. Yes.

## Page 62

1    Q.  Okay.  Do you know whether or not it
2  was Allstate's position that the engineer
3  stamping the report should physically inspect
4  the property?
5    A.  No. I do not know.
6    Q.  Okay.  I'm going to ask you to turn to
7  page 293 in the big binder.
8    A.  At least at the time of this
9  inspection --
10    Q.  Okay.
11    A.  -- I do not know what their policy
12  was.
13    Q.  Okay.  If you --
14    A.  Page what, 294?
15    Q.  293.
16    A.  293.
17    Q.  Do you recognize the part of the
18  Rimkus report which begins at page 293?
19    A.  Protocol checklist, yes.
20    Q.  Okay.  And this is an engineering
21  protocol checklist for evaluating hurricane
22  damage which is given by Allstate Insurance
23  Company to the engineers, correct?
24    A.  Correct.
25    Q.  Okay.  If you would, the first bullet

## Page 63

1  point, the very first requirement of the
2  protocol, would you read that please?  Not
3  what's in bold, which I think is the answer,
4  but the first bullet point.
5    A.  "Describe site and the structures
6  including the age of the structures and
7  relative orientation on the site as observed on
8  date of evaluation.  Reminder: The engineer
9  who is stamping the report must conduct an
10  on-site inspection and supervise all work."
11    Q.  Okay.  The part I want to ask you
12  about, Mr. Neva, is the end of it, the
13  reminder.
14    A.  Uh-huh.
15    Q.  The engineer who is stamping the
16  report must conduct an on-site inspection and
17  supervise all work.
18    A.  Uh-huh.
19    Q.  To your knowledge Craig Rogers did
20  neither of those things, did he?
21        MS. CUNNINGHAM:
22          Objection; lack of foundation.
23  EXAMINATION BY MR. TRAHANT:
24    Q.  To your knowledge Craig Rogers did
25  neither of those things, --

## Page 64

1        MS. CUNNINGHAM:
2          Objection; --
3  MR. TRAHANT:
4          -- did he?
5        MS. CUNNINGHAM:
6          -- lack of foundation.
7  MR. TRAHANT:
8          You can answer it.
9  THE WITNESS:
10          Well, to my knowledge he
11          didn't.  But he could have but I
12          -- I'm not aware of.
13  EXAMINATION BY MR. TRAHANT:
14    Q.  Okay.  I don't want you to
15  speculate, --
16    A.  Yeah.
17    Q.  -- Mr. Neva, I want you to tell me
18  based on the billing records you looked at and
19  your knowledge.
20          First of all, I think we've
21  established that you have no knowledge that
22  Mr. Rogers ever stepped foot on the property
23  before he prepared the report; is that fair?
24    A.  That's correct.
25    Q.  And certainly Mr. Rogers did not

## Page 65

1  supervise you and Tao Xiong at any point until
2  after you had drafted a report, correct?
3    A.  Correct.
4    Q.  As sit here, Mr. Neva, Rimkus
5  Consulting Group violated the very first rule
6  of Allstate's engineering protocol, didn't
7  they?
8        MS. CUNNINGHAM:
9          Violation (sic); lack of
10          foundation.  You know well that
11          there's another invoice because
12          we spoke to the magistrate about
13          it yesterday that discusses
14          precisely what you're trying to
15          get Mr. Neva to discuss.
16  MR. TRAHANT:
17          Off the record.
18    (An off-the-record discussion was held.)
19  EXAMINATION BY MR. TRAHANT:
20    Q.  In -- within the context of what we
21  were talking about --
22    A.  Uh-huh.
23    Q.  -- prior to talking about the
24  engineering protocol.
25    A.  (Nods head.)

## Page 66

1    Q. About an engineer doing an on-site
2    inspection. Wouldn't you think that would be
3    critical in a case of cause and origin?
4        MS. CUNNINGHAM:
5            Objection; vague.
6        THE WITNESS:
7            Well, I — I think it boils
8        down to how many engineers you
9        have and how many assignments you
10       have and -- and if the engineers
11       that were -- that was stamping
12       the report was available to go
13       out and inspect all the
14       properties they wouldn't be
15       hiring people like me to go out
16       and gather information.
17           It would certainly be
18       beneficial to that engineer as,
19       you know, if I was the engineer
20       stamping that report, you know, I
21       would certainly prefer that I am
22       the one out doing the inspection
23       as well. And I would think most
24       engineers would feel that same
25       way.

## Page 67

1        MR. TRAHANT:
2            Okay.
3        THE WITNESS:
4            But I also understand that,
5        you know, when you have maybe
6        thousands of these reports that
7        that — that Rimkus had to
8        prepare I -- I don't know how
9        many, you know, what their —
10       each engineer's backload was and
11       stuff, you know.
12           I understand why it — why
13       it was done the way it was done,
14       you know, hiring outside
15       consultants to go and gather
16       field data.
17   EXAMINATION BY MR. TRAHANT:
18       Q. But -- and I understand, and you gave
19   me a very informative answer. But in terms of
20   trying to determine the cause and origin of a
21   house disappearing that would be something that
22   would require, in your estimation, a personal
23   visit to the property site?
24       MS. CUNNINGHAM:
25           Objection. He's already

## Page 68

1    responded to that question.
2    EXAMINATION BY MR. TRAHANT:
3        Q. Not the way they were doing it,
4    Mr. Neva, but the way you would prefer it to
5    have been done?
6        MS. CUNNINGHAM:
7            Same objection. It's been asked
8        and answered.
9        THE WITNESS:
10           Well, all I can say is it
11       would be preferable — if I was
12       the engineer, it would be
13       preferable to -- for me to go out
14       and do the field work as well as
15       writing the report.
16           If I was an engineer working
17       for a company that had — and we
18       had so much work that all of a
19       sudden now my job is to just
20       write the reports and we had —
21       and use other people, either in
22       the office or consultants to go
23       out and gather the field data, I
24       don't know that I would feel real
25       comfortable with that but I would

## Page 69

1        under — I would definitely
2        understand and hope that I had
3        good people out there gathering
4        the data.
5    EXAMINATION BY MR. TRAHANT:
6        Q. Okay. Do you know how many years of
7    engineering experience Tao Xiong had?
8        A. No, I do not.
9        Q. Is it fair to say that from your
10   recollection, Mr. Neva, and from the Rimkus
11   billing records that you reviewed Craig Rogers'
12   first involvement in this case was January 19th
13   of 2006?
14       MS. CUNNINGHAM:
15           Objection; to the extent there
16       are other invoices out there. He
17       should be permitted to see them.
18       THE WITNESS:
19           Yeah. I wouldn't know when his
20       first involvement was. I would
21       just know when he first contacts
22       me. You know I may assume that
23       that's -- that day is when he
24       first sits down and starts to
25       write the report. That may not

<HR>

1      be the case, you know. I haven't
2      been involved in his end of it.
3  EXAMINATION BY MR. TRAHANT:
4     Q.  Okay. But as far as you know he did
5  not get involved in this case until after you
6  had finalized your initial report, correct?
7     A.  As far as I know.
8     Q.  Okay. And if you'd take a look at
9  page 508 in the big binder.
10    A.  Now, my pages --
11    Q.  Yeah.
12    A.  I've got some pages out of order or
13  something.
14    Q.  And I'll explain to you why.
15    A.  Where is -- so where do I find 508?
16  It's not --
17    Q.  508's before -- flip forward.
18    A.  (Witness complies.) Oh. Got it.
19    Q.  Okay. Now, the page that you have
20  after 508, --
21    A.  878?
22    Q.  -- 878 and then 879. Are these Rimkus
23  invoices that you've not seen before?
24    A.  That's correct, I have not seen them.
25    Q.  Okay. And, again, it's fair to say

1  that from looking at all the invoices I've
2  shown you it appears that Mr. Rogers had no
3  involvement in this case before January 19th of
4  2006, correct?
5    MS. CUNNINGHAM:
6      Objection; lack of foundation.
7    THE WITNESS:
8      Well, I see no evidence in these
9      billings that he had involvement
10     prior to that date.
11  EXAMINATION BY MR. TRAHANT:
12    Q.  Okay. And you're familiar with --
13  with the standards for engineering or I should
14  say are you familiar with any of the standards
15  for engineering?
16    MS. CUNNINGHAM:
17      Objection; vague.
18    THE WITNESS:
19      Not in Louisiana, no.
20  EXAMINATION BY MR. TRAHANT:
21    Q.  I want you to take a look -- I'm going
22  to present the witness with Professional and
23  Occupational Standards for Professional
24  Engineers and Land Surveyors.
25    MS. CUNNINGHAM:

1      Is this for Louisiana?
2    MR. TRAHANT:
3      Yes.
4    MS. CUNNINGHAM:
5      Well, let me object because this
6      witness is not a Louisiana engineer
7      and isn't qualified or competent to be
8      commenting on professional and
9      occupational standards for
10     professional engineers and land
11     surveyors in the State of Louisiana.
12    MR. TRAHANT:
13      Okay. I want --
14    MS. CUNNINGHAM:
15      And all of this is irrelevant.
16  EXAMINATION BY MR. TRAHANT:
17    Q.  I want to ask you to flip, if you
18  would, to page three of that document,
19  Mr. Neva.
20    A.  (Witness complies.)
21    Q.  And on the right-hand side of the page
22  under Subpart D there is an italicized phrase
23  called "responsible charge." Do you see that?
24    A.  Yes.
25    MS. CUNNINGHAM:

1      I'm sorry. Let me make one more
2      objection for the record.
3      I don't know where this came
4      from. It says Louisiana
5      Administrative Code September 2006.
6      I'm not sure if what this is was in
7      effect at the time Mr. Neva was
8      down here. I'm not sure if it's
9      changed since. So I don't know --
10    MR. TRAHANT:
11      Okay.
12    MS. CUNNINGHAM:
13      -- if you can --
14    MR. TRAHANT:
15      If I'm wrong I'm sure --
16    MS. CUNNINGHAM:
17      The relevance or -- yeah, I mean,
18    it's just --
19    MR. TRAHANT:
20      I'm sure it'll be pointed --
21    MS. CUNNINGHAM:
22      -- I haven't seen this before so.
23    MR. TRAHANT:
24      I'm sure it'll be pointed out at
25      trial if I'm wrong.

1  EXAMINATION BY MR. TRAHANT:
2     Q.  Do you remember that wording,
3  Mr. Neva, being in beginning of the Rimkus
4  report, the final Rimkus report, that you and
5  Tao Xiong were performing your work under the
6  responsible charges of Mr. Rogers?
7     MS. CUNNINGHAM:
8        Objection.  This isn't fair to
9     question this man about the --
10    MR. TRAHANT:
11       Okay.
12    MS. CUNNINGHAM:
13       -- Administrative Code of the
14    State of Louisiana.  It just --
15    MR. TRAHANT:
16       I bet you think it's not.
17       Let's take a look -- let's take
18    a --
19    MS. CUNNINGHAM:
20       Well, considering he's never seen
21    it before and hasn't been subjected --
22    I mean he's not an engineer here and
23    that isn't fair.  It's like pointing
24    out statutes and giving them to the
25    Weisses and saying, Could you read

1     them?
2     MR. TRAHANT:
3        Subject to the objection.
4  EXAMINATION BY MR. TRAHANT:
5     Q.  Let's -- let's take a look back at the
6  first page of the Rimkus report.  Which is at
7  -- if you look in your big binder -- keep the
8  page we were just talking about.
9     A.  Uh-huh.
10    Q.  The first page of the Rimkus report is
11 at page 286.  And do you see --
12    A.  Yes.
13    Q.  -- in the second paragraph, Mr. Neva,
14 it says, "Rimkus Consulting Group --
15    A.  Uh-huh.
16    Q.  -- was retained on October 25th of
17 2005 by Keisha Sneed of Allstate Insurance
18 Company to perform a structural evaluation and
19 report of findings of the building.  Mr. Jim
20 Neva and Mr. Tao Xiong, under the responsible
21 charge of Mr. Craig D. Rogers, performed an
22 on-site inspection on November 8, 2005 to
23 evaluate visibly existing conditions at the
24 Weiss residence."  That's inaccurate, isn't it?
25    A.  That's inaccurate --

1     Q.  Yes, sir.
2     A.  -- is what you're saying?
3     Q.  And let me tell you specifically what
4  I'm asking you.
5     A.  Uh-huh.
6     Q.  Mr. Rogers had no supervision over the
7  inspection done by and Mr. Tao Xiong, correct?
8     A.  Correct.
9     Q.  Okay.  Now, that phrase "responsible
10 charge" which is in a document that bears your
11 name is defined under the Professional and
12 Occupational Standards for Louisiana Engineers
13 and it says, Responsible charge defined in
14 RS 37:682: "It shall mean the direct control
15 and personal supervision of engineering or land
16 servicing -- or land surveying service or work
17 as the cause may be."
18    MS. CUNNINGHAM:
19       I have the same objection as I
20    did before that confronting a
21    witness with a Louisiana statute,
22    you know, is just as fair as me
23    confronting the Weisses with one.
24       On top of that, I think
25    prior questions have been asked

1     of him where you're trying to
2     catch him in semantical terms
3     under this administrative code
4     that he's just not aware of.
5  EXAMINATION BY MR. TRAHANT:
6     Q.  I'm asking -- I'm asking you to
7  assume, Mr. Neva, that these were the standards
8  in effect in November of 2005.  As a
9  professional engineer you were not under the
10 responsible charge of Craig Rogers when you
11 inspected this property, were you?
12    MS. CUNNINGHAM:
13       Let me object again.  I mean, we
14    don't have any sort of evidence
15    that is what was in effect as of
16    '05.  In fact, it states at the
17    bottom, September 2006.
18       In addition, we haven't
19    authenticated this document.  We
20    don't know where this came from.
21    And, again, my prior objections
22    as to Mr. Neva commenting on the
23    administrative code stand.
24    MR. TRAHANT:
25       And we can have an objection

1      to every question.
2         But you understand my
3   question, Mr. Neva?
4   THE WITNESS:
5      Yes.
6   MS. CUNNINGHAM:
7      You're also asking him for a
8   legal conclusion, and for that
9   reason we're going to object as
10   well.
11 EXAMINATION BY MR. TRAHANT:
12   Q.  No, sir.  I'm -- I'm asking you for
13 this definition of responsible charge that you
14 just read and I'm asking you this, Mr. Neva,
15 because that phrase is in the report that has
16 your name on it, you would agree with me that
17 Mr. Rogers did not satisfy this definition of
18 responsible charge as a Louisiana licensed
19 engineer?
20   MS. CUNNINGHAM:
21      Objection. You're asking for a
22   legal conclusion and I reiterate
23   all the objections I just made
24   previously.
25   THE WITNESS:

1      I cannot say that he did not
2   comply with the -- with the
3   understanding of responsible
4   charge. We were not under his
5   charge at the time of the
6   inspection.
7      We came under -- we were
8   under the responsibility of the
9   manage -- the regional manager of
10   Rimkus. And, in fact, when we do
11   the preliminary -- send out the
12   preliminary report the name of
13   the engineer is blank. We don't
14   even know who the engineer is
15   going to be.
16      We come under their charge
17   when they -- when the -- at the
18   time -- once we send our report
19   out to them and they review it.
20   And I actually believe that that
21   probably -- that that qualifies
22   as being under their charge.
23   MR. TRAHANT:
24      Okay.
25   THE WITNESS:

1      That's my opinion.
2 EXAMINATION BY MR. TRAHANT:
3   Q.  And certainly you were not ever under
4 Mr. Rogers' charge when you were actually doing
5 the inspection of the property?
6   A.  That is --
7   MS. CUNNINGHAM:
8      Let me interject the same
9   objections that I made
10   previously.
11   MR. TRAHANT:
12      You began to answer. You
13   can complete it.
14   THE WITNESS:
15      That is correct.
16   MR. TRAHANT:
17      Okay.
18   THE WITNESS:
19      As far as I know. I never
20   felt that I was under his charge.
21 EXAMINATION BY MR. TRAHANT:
22   Q.  If you would turn to page 20 of the
23 standards, Mr. Neva.
24   A.  (Witness complies.)
25   Q.  Toward the bottom right-hand side of

1 the page it begins with the phrase,
2 "Responsible charge."
3   A.  Uh-huh.
4   Q.  And it says, and I quote, "Responsible
5 charge requires a licensee or employee to carry
6 out all client contacts, provide internal and
7 external financial control, oversee employee
8 training, and exercise control and supervision
9 over all job requirements, to include research,
10 planning, design, field supervision, and work
11 product review."
12      Now, certainly there was no field
13 supervision by a licensed Louisiana engineer,
14 correct?
15   MS. CUNNINGHAM:
16      Let me interject the same
17   objections as before. In addition,
18   you did not read the entire section.
19   This is a subsection of a section and
20   I'm not sure what the topic is they're
21   even talking about.
22 EXAMINATION BY MR. TRAHANT:
23   Q.  You know -- you know which part I'm
24 referring to, sir?
25   A.  Yeah.

<HR>

```
1        MS. CUNNINGHAM:
2            There's no foundation with this.
3        THE WITNESS:
4            I cannot say that there was not
5        field supervision by a licensed
6        Louisiana engineer.
7            Field supervision does not
8        necessarily mean that that engineer is
9        out there in the field with you.
10            When I was in surveying business
11        you'd have a surveying crew -- most
12        line surveying crews you see out and
13        about, they're under the supervision
14        of a licensed surveyor but that
15        licensed surveyor, more often than
16        not, is not out in the field with
17        them, but he is supervising what
18        they're to be doing out there.
19            And I was supervised as to what I
20        was to be doing out there.
21        EXAMINATION BY MR. TRAHANT:
22        Q.  By whom?
23        A.  Not by Craig Rogers.
24        Q.  Sure.  Sure.
25            By what Louisiana licensed
```

```
1        professional engineer?
2        A.  I was supervised by both the
3        principals at Pacific International Engineering
4        who were -- none of which were licensed
5        Louisiana engineers at that time and I was
6        supervised by the manager of Rimkus here
7        locally.
8        Q.  Who was not a professional engineer
9        either, correct?
10        A.  I do not believe he is.
11        Q.  Okay.
12        A.  Or was.
13        Q.  Now, flip to me, Mr. Neva, if you
14        would, flip for me to page 23.
15        A.  (Witness complies.)
16        Q.  And specifically in the section
17        entitled "seal responsibility."
18        A.  Uh-huh.
19        Q.  And if you go down to Paragraph B it
20        references responsible charge under seal
21        responsibility.  And it says, Plans,
22        specifications, drawings, reports, which is
23        what we're dealing with here.
24        A.  Wait.  Wait.  I'm not following where
25        you're at here.  Oh, under responsible charge?
```

```
1        Q.  Yes.
2        A.  You said B?
3        Q.  It's B --
4        A.  Okay.
5        Q.  -- with a --
6        A.  Oh.  Oh, oh, I see.  Okay.
7        Q.  I'm sorry.
8        A.  Okay.
9        Q.  I misdirected you.
10        A.  Okay, yeah.  Responsible charge, plans
11        specifications, drawings, reports, or other
12        documents will be deemed to have been prepared
13        under the responsible charge of the licensee
14        only when.
15        Q.  Only when, and if you go up to
16        paragraph B in the right-hand column, --
17        A.  Uh-huh.
18        Q.  -- it says, The licensee supervises
19        the initial preparation of the plans,
20        specifications, drawings, reports, or other
21        documents and has continued input into their
22        preparation prior to their completion.
23            That didn't happen here with a
24        licensed Louisiana engineer, did it?
25        MS. CUNNINGHAM:
```

```
1            Let me assert the same objections
2        again and a relevancy objection
3        at this point.  You're asking
4        Mr. Neva, who has never seen this
5        before, to comment on the
6        meanings of these terms in -- in
7        this administrative code that
8        he's just never -- he's never
9        been presented with.
10            It's not only unfair, it's
11        calling for legal conclusions and
12        it's irrelevant as to the facts
13        that he knows related to this
14        case and the opinions that you
15        purport he's qualified to present
16        here that we would dispute that,
17        too.
18        EXAMINATION BY MR. TRAHANT:
19        Q.  Do you understand my question,
20        Mr. Neva?
21        A.  Yes.  I understand the question.
22        Q.  And it's very clear that neither Craig
23        Rogers nor any individual licensed as a
24        professional engineer in Louisiana supervised
25        the initial preparation of the report and had
```

<HR>

1 continued input into the prescription prior to
2 the completion?
3     MS. CUNNINGHAM:
4       Same objections.
5 EXAMINATION MR. TRAHANT:
6   Q. That would be correct, right?
7   A. I really don't know if that is correct
8 or not.
9   Q. Well, can I break it down for you?
10   A. Certainly.
11   Q. Mr. Rogers had no input on the
12 inspection, correct?
13     MS. CUNNINGHAM:
14       Objection; it's vague.
15     THE WITNESS:
16       Unless he was involved in
17     the --
18 EXAMINATION BY MR. TRAHANT:
19   Q. I don't want you to speculate. I'm
20 asking you to your knowledge, not unless or if.
21 I'm asking you, Mr. Neva, to your knowledge
22 Mr. Rogers was not involved in the inspection
23 of the property that you and Tao Xiong
24 conducted?
25   A. To my knowledge.

1   Q. Okay. He was not, correct?
2     MS. CUNNINGHAM:
3       Objection; --
4     THE WITNESS:
5       Was not.
6     MS. CUNNINGHAM:
7       -- vague.
8 EXAMINATION BY MR. TRAHANT:
9   Q. He was not involved and he did not
10 supervise any of the notes that you and Tao
11 took when you were at the Weiss property,
12 correct?
13     MS. CUNNINGHAM:
14       Objection. Same objections as
15     before.
16     THE WITNESS:
17       Did not supervise the taking of
18     the notes?
19     MR. TRAHANT:
20       That's right
21     THE WITNESS:
22       That's correct.
23 EXAMINATION BY MR. TRAHANT:
24   Q. And he did not supervise the
25 preparation of the report that you had

1 finalized and sent to PIE Engineering on
2 November 29th of 2005, correct?
3     MS. CUNNINGHAM:
4       Same objection and relevancy.
5     THE WITNESS:
6       To my knowledge.
7 EXAMINATION BY MR. TRAHANT:
8   Q. That's correct, right?
9   A. That's correct.
10   Q. Would you explain to the jury,
11 Mr. Neva, the engineering theory behind an
12 elevated house that is removed from its pilings
13 or columns?
14     MS. CUNNINGHAM:
15       Objection; vague. I didn't
16     understand it.
17 EXAMINATION BY MR. TRAHANT:
18   Q. Do you understand what I'm asking? If
19 you have an elevated house like -- let's take a
20 look, and I'm not sure at trial what number
21 exhibit this photograph will be, but this is a
22 photograph of the Weiss home, --
23   A. Uh-huh.
24   Q. -- that you've seen before, correct?
25   A. Yes, I've seen that photo before.

1   Q. Okay. What would be the -- the theory
2 behind how that house if it floats off of those
3 columns how does happen?
4     MS. CUNNINGHAM:
5       Let me -- let me just interpose
6     an objection because we have --
7     because we're getting this on video
8     and, Mr. Neva, --
9     THE WITNESS:
10       Uh-huh.
11     MS. CUNNINGHAM:
12       -- we have an objection to
13     Mr. Neva's qualifications to comment
14     on how Mr. -- the deconstruction of
15     the home, and given that objection.
16 EXAMINATION BY MR. TRAHANT:
17   Q. You have an appreciation of how that
18 happens, do you not?
19   A. I believe I do.
20   Q. Okay. Would you tell the jury how, in
21 your opinion, that happens?
22     MS. CUNNINGHAM:
23       Again, I have the same objection.
24     THE WITNESS:
25       Well, normally if a house floats

<HR>

1    off its supports it usually takes
2    -- what happens is the water
3    rises, slowly, and as it rises
4    the water elevation outside the
5    house becomes higher than the
6    water elevation inside, depending
7    on how tight the house is
8    constructed, tightly the house is
9    constructed.
10    The house then acts like a
11   boat. And the buoyancy, the
12   uplift, becomes strong enough to
13   overcome the dead weight of the
14   house as well as the strength of
15   the connections and it floats
16   off.
17    Depending on wind action,
18   wave action, it may or may not
19   float straight up. It may -- it
20   may twist, it may go off in one
21   single direction. That's all
22   dependent on, you know, what
23   outside forces that are being
24   pushed against it at the same
25   time as it's getting this uplift.

1    Houses can also, due to
2    storm surge, and floating debris
3    they can be knocked off their
4    supports as well. The supports
5    can be knocked out from under it.
6    But as far as floating of a
7    house, generally, I think I've
8    described the way -- my
9    understanding is the way houses
10   float off of their piling or --
11   or it could be at ground level.
12   EXAMINATION BY MR. TRAHANT:
13    Q. Okay. So if -- if this house was 17
14   feet above sea level, --
15    A. Uh-huh.
16    Q. -- the tidal surge -- put the wave
17   action out of it right now.
18    A. Uh-huh.
19    Q. The tidal surge --
20    A. Uh-huh.
21    Q. -- would have to be somewhere around
22   18 or 19 feet to float this structure off of
23   its columns, correct?
24    A. Above sea level?
25    Q. Yeah.

1    A. Uh-huh.
2    Q. And you know that the Rimkus report
3    says that the tidal surge on Treasure Isle was
4    14 feet above sea level, correct?
5    A. No, I don't -- okay. It makes no
6    reference to -- oh, okay -- Storm surge
7    estimates from FEMA indicate --
8    Q. Wait. Wait. Wait. You have to read
9    it clearly. She's got to get it --
10    A. Oh.
11    Q. -- down.
12    A. Storm surge estimates from FEMA
13   indicated the storm surge near the property was
14   14 feet above sea level.
15    Q. Okay. So it's highly unlikely that
16   that water got high enough to remove this house
17   in the manner in which you've described;
18   floating it off of its columns, correct?
19    MS. CUNNINGHAM:
20     Let me pose the same objection
21     and relevancy, too. I don't know that
22     a floating house is at issue here.
23   EXAMINATION BY MR. TRAHANT:
24    Q. Do you understand my question,
25   Mr. Neva?

1    A. Yes, I understand the question. I
2    don't know that I can corroborate that the
3    house was at 16 or 17 feet above sea level and
4    that the storm surge was at 14 feet above sea
5    -- I don't -- I don't know where sea level is
6    out there. You know I don't know what the
7    ground elevation is in other words. I do know
8    that the -- there was evidence that the water
9    was --
10    Q. Would you look at --
11    A. -- pretty high up in those trees.
12    Q. Would you look at page 417 of this
13   document, meaning the big binder?
14    A. Certainly. And the elevation
15   certificate?
16    Q. Yes, sir.
17    A. Uh-huh.
18    Q. And you have a clearer version of it
19   in the report -- the records that were provided
20   to me by Rimkus. And I'd like you to read
21   Section 2-A.
22    A. Firm zones 1-A30, AE, AH, and A, the
23   top of the referenced floor -- of the
24   referenced level floor from the selected
25   diagram is at an elevation of 18 feet NGVD.

<HR>

1    Q.  And that is four feet higher than the
2  Rimkus report indicates the maximum tide surge
3  got?
4    A.  That's correct.
5       MS. CUNNINGHAM:
6         Objection; relevance.
7       MR. TRAHANT:
8         I think he said "that's
9       correct."
10      MS. CUNNINGHAM:
11        Well, I think I objected,
12      too, Mr. Trahant.
13  EXAMINATION BY MR. TRAHANT:
14    Q.  To revert to something you testified
15  to earlier, Mr. Neva, you found it significant
16  that the concrete columns from the home were
17  scattered facing different directions, correct?
18    A.  That's --
19      MS. CUNNINGHAM:
20        Again, let me --
21      THE WITNESS:
22        -- correct.
23      MS. CUNNINGHAM:
24        -- pose my objection, the Daubert
25      objection, that we asserted at the

1       beginning of his testimony.
2  EXAMINATION BY MR. TRAHANT:
3    Q.  And in looking through that report,
4  which I think three-and-a-half pages before you
5  get to the photographs, Mr. Rogers never
6  mentions this finding from you and Mr. Xiong,
7  correct?
8       MS. CUNNINGHAM:
9         Same objection.
10      THE WITNESS:
11        Let me look at the
12      observations.
13        No, it was not mentioned.
14  EXAMINATION BY MR. TRAHANT:
15    Q.  Okay.  And you're aware now -- well,
16  let me ask you this so the jury understands.
17  You have had an opportunity to review the
18  Weiss's engineer's report from Quick and
19  Associates, have you not?
20    A.  Yes.
21    Q.  And just like you did and just like
22  Tao Xiong did Mr. Quick found the different
23  directional lying of the columns to be
24  significant; you're aware of that, correct?
25      MS. CUNNINGHAM:

1         Objection; leading, lack of
2       foundation.
3       THE WITNESS:
4         That was mentioned in the
5       report as a reason for him
6       drawing that conclusion.
7  EXAMINATION BY MR. TRAHANT:
8    Q.  Okay.  And you would agree that that's
9  a sound engineering conclusion, correct?
10      MS. CUNNINGHAM:
11        Let me object to that.  Again,
12      our Daubert objections, agreeing
13      whether it's a sound engineering
14      conclusion is vague, and given
15      our Daubert objections it's
16      irrelevant.
17  EXAMINATION BY MR. TRAHANT:
18    Q.  Do you find that to be an unsound
19  engineering conclusion, Mr. Neva?
20      MS. CUNNINGHAM:
21        Same objection.
22      THE WITNESS:
23        No.  I think there's -- there's
24      -- there's more evidence than
25      just those piling out there,

1       though, or columns.
2  EXAMINATION BY MR. TRAHANT:
3    Q.  And that was evidence not noted
4  necessarily by you and Mr. Xiong but eventually
5  drawn to your attention by Mr. Rogers, correct?
6    A.  Correct.
7    Q.  And you would agree that this was a
8  very slow rising surge?
9       MS. CUNNINGHAM:
10        Objection; assumes facts not in
11      evidence.
12      MR. TRAHANT:
13        Let me --
14      MS. CUNNINGHAM:
15        We haven't --
16      MR. TRAHANT:
17        Let me --
18      MS. CUNNINGHAM:
19        -- even touched on that.
20      MR. TRAHANT:
21        Let me back it up.
22  EXAMINATION BY MR. TRAHANT:
23    Q.  You don't contend, Mr. Neva, that
24  there was a tidal wave that hit Treasure Isle,
25  do you?

1  MS. CUNNINGHAM:
2      Objection; vague.
3  THE WITNESS:
4      No.
5  EXAMINATION BY MR. TRAHANT:
6      Q.  Okay.  And from your experience in
7  doing the 125 Katrina damaged claims are you
8  aware that the surge was actually water rising
9  over a long period of time?
10  MS. CUNNINGHAM:
11      Let me object to that.  We
12      haven't established those 125 claims
13      were before, after, or what the time
14      relation is as to the Weiss's.  We
15      aren't -- we don't know where they
16      were.
17  MR. TRAHANT:
18      Okay.  I'm ask --
19  MS. CUNNINGHAM:
20      We just don't have a
21      foundation for this line of
22      questioning.
23  EXAMINATION BY MR. TRAHANT:
24      Q.  I'm asking you now, --
25      A.  Uh-huh.

1      Q.  -- is it your position that this water
2  rose very quickly or that it rose over several
3  hours?
4  MS. CUNNINGHAM:
5      Objection; vague.
6  THE WITNESS:
7      Over several hours.
8  EXAMINATION BY MR. TRAHANT:
9      Q.  Okay.  And at a given point in time
10  all of the water from the surge would have been
11  moving in the same direction, correct?
12  MS. CUNNINGHAM:
13      Objection; there's just a lack of
14      foundation for this questioning.
15  THE WITNESS:
16      Well, --
17  MS. CUNNINGHAM:
18      Let me reassert our Daubert
19      objections as well.
20  THE WITNESS:
21      No, I -- I don't know which
22      direction the water would have
23      been moving in any given spot.
24      As the water rises and it's --
25      different locations, it's going

1  to be going in different
2  directions.
3  EXAMINATION BY MR. TRAHANT:
4      Q.  Okay.  Now, --
5      A.  Maybe all along Treasure Isle it's all
6  going in the same direction.
7      Q.  Okay.
8      A.  But over at the Chef Menteur Bridge it
9  might be going in a different direction.
10      Q.  Chef Menteur on that.  Now I know --
11      A.  Menteur.
12      Q.  Now I know you're not from Louisiana.
13  You've also -- now, I've provided you
14  copy of the report from the engineering firm
15  MACTEC, correct?
16      A.  Uh-huh.
17      Q.  And --
18  MS. CUNNINGHAM:
19      Let me object that's -- doesn't
20      make sen -- I mean MACTEC, which
21      report?  What are we talking
22      about here?
23  MR. TRAHANT:
24      We can refer -- we'll get to
25      the little binder now which you

1  have in here.
2  EXAMINATION BY MR. TRAHANT:
3      Q.  If you would turn for me, Mr. Neva, to
4  page 28 in the small binder.
5  MS. CUNNINGHAM:
6      Before we get to that document
7      let me object to the relevance of
8      it.  That report has not been
9      authenticated.  Again, our
10      Daubert objections that he's not
11      a professional engineer and not
12      competent to testify as to the --
13      the deconstruction of houses and
14      it's irrelevant.  If I didn't say
15      that.
16  EXAMINATION BY MR. TRAHANT:
17      Q.  Okay.  This is a document that you've
18  had an opportunity to review before coming here
19  to testify today, correct, Mr. Neva?
20      A.  That's correct.
21      Q.  Okay.
22  MS. CUNNINGHAM:
23      Could we identify it for the
24      record?
25  MR. TRAHANT:

Page 102

1     This is the MACTEC Property
2  Assessment Report from MACTEC
3  Engineering prepared for Allstate
4  Insurance Company relative to the
5  property located at 29 Treasure
6  Isle, owned by Oscar and Peggy
7  Nugent.
8  EXAMINATION BY MR. TRAHANT:
9     Q.  Now, this report, Mr. Neva, would
10 indicated to you that these -- these engineers,
11 who stamped this report, actually inspected the
12 property on behalf of Allstate unlike Rimkus,
13 correct.
14    MS. CUNNINGHAM:
15       Objection.  That assumes facts
16    not in evidence.  We don't have
17    the MACTEC engineers here to
18    discuss with them what they did
19    or did not do.
20       Again, all my prior
21    objections that this is
22    irrelevant as not involving the
23    same property, it has not been
24    authenticated, and that Mr. Neva
25    isn't competent to testify as to

Page 103

1  the conclusions on deconstruction
2  of homes apply.
3  MR. TRAHANT:
4     Well, I think he's plenty
5  competent to testify as to what
6  he's reviewed.
7     And let me --
8  MS. CUNNINGHAM:
9     Documents that you've
10 provided to him to review for
11 today.
12 MR. TRAHANT:
13    Let me -- correct.  Oh,
14 that's absolutely correct.
15 EXAMINATION BY MR. TRAHANT:
16    Q.  Let me break this down, Mr. Neva.
17 From reviewing this report do you understand
18 that this is a Treasure Isle report prepared
19 for Allstate Insurance Company?
20    MS. CUNNINGHAM:
21       Same objections.
22    THE WITNESS:
23       That's correct.
24 EXAMINATION BY MR. TRAHANT:
25    Q.  And --

Page 104

1     A.  That's what it appears to be.
2     Q.  And does it also appear that the two
3  engineers who did the field assessment were
4  actually -- or one of those engineers signed on
5  the report?
6     A.  And stamped it.
7     Q.  Right.
8     A.  That's correct.
9     Q.  Okay.  Now, this report, as I
10 appreciate it and you can tell me if I'm wrong,
11 the inspection was done on October 18th of
12 2005, the report was completed and mailed to
13 Allstate Insurance Company on October 18,
14 2005, --
15    MS. CUNNINGHAM:
16       Let me insert --
17    MR. TRAHANT:
18       -- is that what this document
19    would indicate?
20    MS. CUNNINGHAM:
21       Let me insert the same
22    objections.  In addition, it's asking
23    Mr. Neva to speculate and in addition
24    the document's hearsay.
25    MR. TRAHANT:

Page 105

1     From --
2  MS. CUNNINGHAM:
3     The MACTEC folks aren't here.
4  MR. TRAHANT:
5     This -- and to respond to that,
6  this is an engineer relying on another
7  expert's work which certainly he can
8  do within the context of giving his
9  opinions.
10 MS. CUNNINGHAM:
11    I maintain my objections.  He was
12 not --
13 MR. TRAHANT:
14    Okay, you made your objections,
15 Meredith.  If he can answer it, he can
16 answer.
17 THE WITNESS:
18    According to this report that's
19 correct.
20 EXAMINATION BY MR. TRAHANT:
21    Q.  And according to the report, Mr. Neva,
22 there is a conclusions and recommendations for
23 additional assessment section, and that would
24 be on Bates stamped page No. 33.
25    A.  Correct.

<HR>

1    Q.  And the two bullet points, would you
2  please read those for the jury?
3    A.  Based on --
4      MS. CUNNINGHAM:
5        And let me interpose my same
6  objections.
7      MR. TRAHANT:
8        Okay.
9      MS. CUNNINGHAM:
10       Before he answers.
11     MR. TRAHANT:
12       Are you going to make all of
13  them again?
14     MS. CUNNINGHAM:
15       No.  It's the same
16  objections I made --
17     MR. TRAHANT:
18       Okay.
19     MS. CUNNINGHAM:
20       -- to your prior question.
21     THE WITNESS:
22       "Based on observations of
23  surrounding properties comma
24  debris fields comma and failure
25  of piers slash piles comma it

1  appears the initial failure --
2  failure of the structure was
3  caused by hurricane or higher
4  velocity winds.
5      Complete destruction was a
6  result of the following storm
7  surge and/or flood waters."
8  EXAMINATION BY MR. TRAHANT:
9    Q.  That correlates with you and
10  Mr. Xiong's original opinion, does it not?
11   A.  Yes.
12   Q.  I would also like for you to take a
13  look at page 84 and tell the jury who provided
14  that document to you?
15   A.  Is this the other document that you
16  mailed to me?
17   Q.  It is.
18   A.  Yeah, okay.
19     MS. CUNNINGHAM:
20       Before we talk about the document
21  I want to assert the same
22  objections that it's hearsay,
23  irrelevant.  It wasn't a part of
24  his consideration of the Weiss
25  property.

1      MR. TRAHANT:
2        That's the point.
3      MS. CUNNINGHAM:
4        And the Daubert objections
5  that we have --
6      MR. TRAHANT:
7        Okay.
8      MS. CUNNINGHAM:
9        -- outstanding.
10  EXAMINATION BY MR. TRAHANT:
11   Q.  Mr. Neva, do you recognize what
12  company generated this report?
13   A.  Yes.
14   Q.  And what company generated the report
15  on the Aucoin property at 25239 Chef Menteur
16  Highway on Lake Catherine?
17   A.  Rimkus Consulting Group.
18   Q.  Did you have occasion to work with
19  Gary Hemphill, Ph.D. or Thomas Heifner the
20  engineer who stamped this report?
21   A.  Did I have occasion to work with him?
22   Q.  Yeah.  Do you know who they are?
23   A.  Well, I know who they are, but I never
24  worked with them.
25   Q.  Okay.  Now, if you look at the

1  observation section on page 85 it says that
2  this structure was raised eight feet above the
3  ground and supported on wood piers.  Okay?
4    A.  Uh-huh.
5    Q.  You would agree that the Weiss
6  property would have been higher than this
7  assuming the slab was not five or six feet off
8  the ground?
9    A.  That's correct.
10     MS. CUNNINGHAM:
11       Let me object to the line of
12  questioning for the same reasons
13  as noted before.
14  EXAMINATION BY MR. TRAHANT:
15   Q.  Okay.  There are conclusions made in
16  this report.  Do you know from doing your
17  inspections, Mr. Neva, where Lake Catherine was
18  in relation to Treasure Isle?
19   A.  Yes.
20   Q.  It was about -- this property is about
21  an eighth of a mile from Treasure Isle,
22  correct?
23     MS. CUNNINGHAM:
24       Objection.  Assuming facts not in
25  evidence.

1  THE WITNESS:
2      Probably about that
3  distance, as the crow flies.
4  EXAMINATION BY MR. TRAHANT:
5  Q. You could paddle there across the --
6  A. Uh-huh.
7  Q. -- Rigolets, --
8  A. Uh-huh.
9  Q. -- correct?
10  A. Uh-huh.
11  Q. Okay. Would you read for the jury
12  Rimkus' conclusions relative to the Aucoin
13  property on Lake Catherine in enumerated one
14  and two on page 84?
15      MS. CUNNINGHAM:
16      Okay. Let me interpose the same
17  objections as before along with
18  relevancy.
19      THE WITNESS:
20      The house was destroyed by
21  very high violent winds. The
22  debris was washed away by the
23  storm surge and the flooding.
24  EXAMINATION BY MR. TRAHANT:
25  Q. Now, that sounds consistent with the

1  MACTEC report you just reviewed, correct?
2      MS. CUNNINGHAM:
3      Objection. Same objections as
4  before and irrelevant.
5      MR. TRAHANT:
6      Well.
7      THE WITNESS:
8      Well, the --
9      MR. TRAHANT:
10      -- let me --
11      THE WITNESS:
12      -- the conclusion is pretty
13  much the same. I don't know that
14  the buildings were anything near
15  the same.
16  EXAMINATION BY MR. TRAHANT:
17  Q. Okay. And that's a good point. The
18  report here indicates that at Lake Catherine
19  and on page 86, specifically, the structure was
20  destroyed by the 140 mile per hour hurricane
21  winds.
22  A. Uh-huh.
23  Q. Okay.
24  A. That's correct. That what it says.
25  Q. And it would be from your perspective,

1  Mr. Neva, to assume that those 140 mile an hour
2  winds referenced here would have been about the
3  same at Treasure Isle knowing the geography,
4  correct?
5      MS. CUNNINGHAM:
6      Objection. It assumes facts not
7  in evidence and our Daubert
8  objections.
9      THE WITNESS:
10      Correct.
11      MS. CUNNINGHAM:
12      Along with relevancy.
13      THE WITNESS:
14      Correct.
15      Then there are -- you can have
16  different wind velocities two homes,
17  three lots apart, depending on if
18  there's some kind of wind break at one
19  that there isn't at another. But,
20  generally, I mean, the Weiss property
21  was very exposed to the winds.
22  EXAMINATION BY MR. TRAHANT:
23  Q. So any variation in winds wouldn't be
24  significant with that small of --
25  A. I wouldn't --

1  Q. -- a distance?
2  A. I wouldn't --
3      MS. CUNNINGHAM:
4      Now, that poses the same
5  objections.
6      THE WITNESS:
7      I would not expect it to be.
8  EXAMINATION BY MR. TRAHANT:
9  Q. Okay. And you're familiar with the
10  Fujita scale regarding damage to construction,
11  correct?
12  A. Yes.
13  Q. If you'd turn to page 118.
14  A. (Witness complies.)
15  Q. So that the jury knows I had also
16  provided you with a copy of the AccuWeather
17  Report, correct?
18  A. Correct.
19      MS. CUNNINGHAM:
20      Before we start the questioning
21  on this document let me object to
22  hearsay, relevancy.
23      Assuming all the facts are
24  in evidence that Mr. Neva hasn't
25  been qualified as a weather

<HR>

## Page 114

```
1    expert to discuss the weather.
2    He hasn't been qualified at all,
3    but even to the extent he was --
4    his qualification has been
5    attempted here, it was not one of
6    a weather expert.
7    MR. TRAHANT:
8        Well, I understand that
9    Allstate believes that Mr. Neva
10   is not qualified to give any
11   opinion. I differ.
12   MS. CUNNINGHAM:
13       That's not what we're
14   saying.
15   MR. TRAHANT:
16       The witness testified very
17   clearly that he was familiar with
18   the Fujita scale.
19   MS. CUNNINGHAM:
20       But so am I, Mr. Trahant, it
21   doesn't mean I should testify
22   again -- about it.
23   MR. TRAHANT:
24       You're not an engineer.
25   MS. CUNNINGHAM:
```

## Page 115

```
1    No.
2    EXAMINATION BY MR. TRAHANT:
3    Q.  Mr. Neva, --
4    MS. CUNNINGHAM:
5        Right.
6    EXAMINATION BY MR. TRAHANT:
7    Q.  Mr. Neva, if you look on page 118 and
8    look down at what happens to the best quality
9    construction home at 141 miles an hour, what
10   type of damage would you expect from the Fujita
11   scale?
12   MS. CUNNINGHAM:
13       Let me just object again on the
14   same grounds. And I don't even
15   know it that's -- I don't even
16   know which Fujita scale that is;
17   if it's changed over time. We
18   haven't had any sort of
19   authentication into that
20   document.
21   THE WITNESS:
22       It says, Entire house shifts off
23   foundation.
24   EXAMINATION BY MR. TRAHANT:
25   Q.  Okay. So it would be a reasonable
```

## Page 116

```
1    conclusion from your perspective that if the
2    Weiss home was battered by 140 mile an hour
3    winds it could have been shifted off of its
4    foundation.
5    MS. CUNNINGHAM:
6        Let me pose the same objections
7    as before; Daubert, relevancy,
8    authentication, hearsay, and we
9    don't even know what we're
10   looking at.
11   MR. TRAHANT:
12       You can answer it.
13   THE WITNESS:
14       According to the Fujita
15   scale.
16   EXAMINATION BY MR. TRAHANT:
17   Q.  Okay.  Now, I would like for you to
18   take a look, Mr. Neva, at the Weiss's
19   engineer's report which is a Quick and
20   Associates report.
21   A.  (Witness complies.)
22   Q.  And if you would flip eight pages in,
23   you understand that photograph one was taken by
24   reference in the report?
25   MS. CUNNINGHAM:
```

## Page 117

```
1        Could I --
2    MR. TRAHANT:
3        -- from --
4    MS. CUNNINGHAM:
5        Could I object just for a
6    second?
7    MR. TRAHANT:
8        Oh, I -- I was certain that
9    you would.
10   MS. CUNNINGHAM:
11       Well, no, could we just go
12   off the record for one second?
13   MR. TRAHANT:
14       You want to --
15   MS. CUNNINGHAM:
16       I just have a --
17   MR. TRAHANT:
18       -- object --
19   MS. CUNNINGHAM:
20       -- question.
21   MR. TRAHANT:
22       -- or we're going off the
23   record?
24   MS. CUNNINGHAM:
25       No.  I just want to go off
```

Page 118

1  the record. I don't --
2  MR. TRAHANT:
3      Okay.
4  MS. CUNNINGHAM:
5      You know, I don't --
6  MR. TRAHANT:
7      All right.
8  (An off-the-record discussion was held.)
9  EXAMINATION BY MR. TRAHANT:
10     Q.  Mr. Neva, before we talk about the
11  photograph that I just directed your attention
12  to, assuming those MACTEC conclusions were as
13  stated in that report, that would be consistent
14  with your original conclusion, correct?
15     MS. CUNNINGHAM:
16         Let me pose the same objection as
17      I did before. Plus, I think we
18      asked and answered that one
19      already.
20     THE WITNESS:
21         Yes.
22  EXAMINATION BY MR. TRAHANT:
23     Q.  Assuming the Rimkus Aucoin report,
24  assuming those conclusions were the conclusions
25  of Rimkus for that particular property, those

Page 119

1  conclusions would have mirrored your original
2  conclusion on the Weiss claim, correct?
3      MS. CUNNINGHAM:
4          I have the same objections.
5      THE WITNESS:
6          Correct.
7  EXAMINATION BY MR. TRAHANT:
8      Q.  And assuming that the documents I
9  showed you earlier from the Allstate claims
10  file were at that time documented in the
11  Allstate claims file they would be consistent
12  with your original conclusion, correct?
13     MS. CUNNINGHAM:
14         I have the same objections; the
15      Daubert objections.
16     THE WITNESS:
17         Yes.
18     MR. TRAHANT:
19         Okay.
20     THE WITNESS:
21         Not I see the relevance.
22     MR. TRAHANT:
23         I'm not asking you to be the
24      judge. Just be the witness.
25     THE WITNESS:

Page 120

1          I'm sure you do though.
2  EXAMINATION BY MR. TRAHANT:
3      Q.  The -- are you aware of several
4  pending lawsuits against Rimkus Consulting
5  Group for fraud resulting from Hurricane
6  Katrina?
7      MS. CUNNINGHAM:
8          Objection; relevance. Assuming
9      facts not in --
10     THE WITNESS:
11         No, --
12     MS. CUNNINGHAM:
13         -- evidence.
14     THE WITNESS:
15         -- I'm not.
16  EXAMINATION BY MR. TRAHANT:
17     Q.  You're not aware of those?
18     A.  No.
19     Q.  Okay. Pacific International has not
20  made you aware of those lawsuits?
21     A.  No.
22     MS. CUNNINGHAM:
23         Same objection.
24  EXAMINATION BY MR. TRAHANT:
25     Q.  It's true, is it not, Mr. Neva, that

Page 121

1  an attorney from Texas by the name of David
2  Ward tried to dissuade you from coming here
3  voluntarily to give your testimony today?
4      MS. CUNNINGHAM:
5          Objection; relevance. Assumes
6      facts not in evidence; and --
7      THE WITNESS:
8          I wouldn't say --
9      MS. CUNNINGHAM:
10         -- lack of --
11     THE WITNESS:
12         -- that he --
13     MS. CUNNINGHAM:
14         -- foundation.
15     THE WITNESS:
16         -- tried to dissuade me from
17      coming here. He tried to dis --
18      he did not seem to be pleased
19      that I was making the
20      arrangements through you.
21     MR. TRAHANT:
22         Okay.
23     THE WITNESS:
24         Or through Allstate. He --
25     MR. TRAHANT:

Page 122

1 Okay.
2 THE WITNESS:
3 He felt that I should make
4 my arrangements through Rimkus.
5 MR. TRAHANT:
6 Okay.
7 THE WITNESS:
8 Pacific International felt
9 that I should make my
10 arrangements through Pacific
11 International.
12 EXAMINATION BY MR. TRAHANT:
13 Q. And you would agree, Mr. Neva, from an
14 engineering perspective that it is just as
15 likely, from a theoretical stand point, that
16 the house on Treasure Isle was destroyed by
17 wind as it was destroyed by water?
18 MS. CUNNINGHAM:
19 Let me assert our Daubert
20 objections. I want to assert
21 that that's a vague question,
22 "from an engineering stand
23 point." There are all sorts of
24 engineering stand points. And
25 it's leading and then --

Page 123

1 EXAMINATION BY MR. TRAHANT:
2 Q. From your standpoint, Mr. Neva?
3 MS. CUNNINGHAM:
4 Same -- same objections.
5 MR. TRAHANT:
6 Let me back up. I'm not
7 going to ask you -- I'll withdraw
8 that question as asked.
9 EXAMINATION BY MR. TRAHANT:
10 Q. Let's talk a look at photograph number
11 one attached to the Quick report.
12 A. Uh-huh.
13 Q. You've had an opportunity to review
14 that before, correct?
15 A. Correct.
16 Q. What was that house destroyed by?
17 MS. CUNNINGHAM:
18 Objection. I mean, what is this
19 photograph, number one. I'm
20 looking at photograph number one
21 for the Quick report it is a
22 black and white picture.
23 There's no -- as far as I
24 can tell, no reference as to
25 where this is, no authentication

Page 124

1 as to who took this photograph,
2 no reference as to Mr. Neva ever
3 having seen this photograph or
4 this property.
5 MR. TRAHANT:
6 I think he just said he
7 reviewed it.
8 MS. CUNNINGHAM:
9 He's seen the photograph.
10 THE WITNESS:
11 The photograph.
12 MS. CUNNINGHAM:
13 I have too, --
14 MR. TRAHANT:
15 Okay.
16 MS. CUNNINGHAM:
17 -- Mr. Trahant, it doesn't
18 mean that all my objections don't
19 still stand.
20 EXAMINATION BY MR. TRAHANT:
21 Q. Let me ask you this: Did you see this
22 property on Treasure Isle when you went out
23 there?
24 MS. CUNNINGHAM:
25 To the extent you can see it in

Page 125

1 this photograph. It's not a good
2 photograph, Mr. Trahant.
3 THE WITNESS:
4 I don't recall it. I very
5 well could have. The only time I
6 was ever out on Treasure Isle,
7 that I can recall, was the day
8 that I did the Weiss inspection.
9 I don't believe I -- I'm quite
10 sure that I never had another
11 inspection on Treasure Isle that
12 I can recall anyhow.
13 So, I mean, there's certain
14 areas out there, like in the
15 Rigolets, and then -- that I was
16 out at -- I made a lot of visits
17 to. So I can look at a photo and
18 say, oh, yeah, I remember seeing
19 that house several times.
20 This one I don't recall
21 seeing.
22 MR. TRAHANT:
23 Okay.
24 THE WITNESS:
25 If it was out there I

1   probably did see it though.
2   EXAMINATION BY MR. TRAHANT:
3       Q.  Okay.  And assuming that this
4   photograph was taken from the slab of number 13
5   Treasure Isle, would you assume that that would
6   have been something you looked at while you
7   were out there?
8       A.  Uh-huh.
9       Q.  And --
10      MS. CUNNINGHAM:
11          I have the same objections.
12          We're now assuming facts not in
13      evidence.
14  EXAMINATION BY MR. TRAHANT:
15      Q.  And would you further have an opinion
16  as to what destroyed this structure on Treasure
17  Isle?
18      MS. CUNNINGHAM:
19          And I have the same objections.
20      I mean, frankly, I can't even
21      tell what the structure is --
22      THE WITNESS:
23          Yeah.
24      MS. CUNNINGHAM:
25          -- from this --

1       THE WITNESS:
2           I can't tell --
3       MS. CUNNINGHAM:
4           -- photograph.
5       THE WITNESS:
6           -- by looking at this photo.
7       Because I'd -- I'd have to be out
8       there and see -- I'd have to know
9       which direction it's facing and
10      I'd have to look, you know,
11      closer up to, you know, this --
12      I mean, does it look like a
13      tornado hit?  Yeah, this looks
14      like a tornado hit.
15  EXAMINATION BY MR. TRAHANT:
16      Q.  Okay, thanks.
17          You would also agree with me,
18  Mr. Neva, that you could not ascribe any
19  percentage of what part of this house was
20  destroyed by wind and what part was destroyed
21  by water; isn't that correct?
22      MS. CUNNINGHAM:
23          Let me assert our Daubert
24      objections again.
25      THE WITNESS:

1           Well, the way that -- when you --
2       when you -- when you're doing the
3       inspections and you come across a
4       slab what we do is you look at
5       the weather data, the Compu
6       Weather data, generally, and, you
7       know, the Saffir-Simpson scale or
8       -- or Fujita scale and -- and
9       like these photos of what the --
10      or whatever knowledge you have of
11      what the structure was -- how the
12      structure was built before it was
13      destroyed, and based on that,
14      yeah, you assign certain damages
15      to wind and -- and then
16      wind-blown rain and certain
17      damage to storm surge.
18  EXAMINATION BY MR. TRAHANT:
19      Q.  Okay.  And you would agree that it was
20  some combination of wind and water that
21  destroyed this house?
22      MS. CUNNINGHAM:
23          Objection; vague.
24      MR. TRAHANT:
25          Do you believe that?

1       MS. CUNNINGHAM:
2           And I have --
3       THE WITNESS:
4           Yes.
5       MS. CUNNINGHAM:
6           -- the same objections as to
7       Daubert.
8   EXAMINATION BY MR. TRAHANT:
9       Q.  But you don't have a position as to
10  what percentage was destroyed by wind and what
11  percentage was destroyed by water, do you?
12      MS. CUNNINGHAM:
13          I have the same objections.
14      THE WITNESS:
15          No, I don't.
16  EXAMINATION BY MR. TRAHANT:
17      Q.  You just don't know, correct?
18      MS. CUNNINGHAM:
19          Same objections.
20      THE WITNESS:
21          Yes.
22  EXAMINATION BY MR. TRAHANT:
23      Q.  But you would be aware, Mr. Neva, that
24  if Rimkus determines the loss to be from storm
25  surge that Allstate pays my clients less;

## Page 130

1 you're aware of that, right?
2     MS. CUNNINGHAM:
3         Objection; relevance.
4     MR. TRAHANT:
5         Oh, it's very relevant.
6     MS. CUNNINGHAM:
7         Are you saying Mr. Neva was
8 influenced by that?
9     MR. TRAHANT:
10        No, I am not at all.
11    THE WITNESS:
12        Well, I'm only -- I would
13 only be aware of that based on
14 the conversation with Mr. Weiss
15 stating that, you know,
16 homeowner's coverage versus flood
17 coverage.
18 EXAMINATION BY MR. TRAHANT:
19    Q.  Okay.  And -- so with that
20 understanding are you aware that if Rimkus
21 finds that it was flood and Allstate adopts
22 that position then Allstate pays less?
23    MS. CUNNINGHAM:
24        No, that's -- objection;
25 relevance. It's assuming facts

## Page 131

1 not in evidence. It's leading
2 and --
3     MS. GRAVENER:
4         Asks for a legal conclusion.
5     MS. CUNNINGHAM:
6         -- pending -- right again,
7 yeah,
8     MR. TRAHANT:
9         Let me back up.
10    MS. CUNNINGHAM:
11        -- it does ask about the
12 legal conclusions you can draw
13 from the policy.
14 EXAMINATION BY MR. TRAHANT:
15    Q.  What do you understand the basis of
16 this lawsuit to be?
17    MS. CUNNINGHAM:
18        Objection; relevance. Why are
19 you asking an engineer from Washington
20 what his understanding of this lawsuit
21 is?
22    MR. TRAHANT:
23        Because this gentleman very
24 graciously flew all the way across the
25 country and certainly as he sits here

## Page 132

1 as a witness, thrust into this case by
2 Allstate, not the Weisses, he has to
3 have some understanding of why he so
4 magnanimously, and I say that with all
5 sincerity, flew here voluntarily
6 without a subpoena.
7     MS. CUNNINGHAM:
8         Well, just so the record is clear
9 we don't thrust him into this -- into
10 New Orleans, but -- and I do agree,
11 though, it was very magnanimous of him
12 to come down here so we could avoid a
13 trip to Oregon.
14    MR. TRAHANT:
15        Okay.
16    MS. CUNNINGHAM:
17        And I appreciate it.
18 EXAMINATION BY MR. TRAHANT:
19    Q.  I'll ask a simple question, Mr. Neva.
20 Do you understand this to be what's been termed
21 a wind versus water case?
22    MS. CUNNINGHAM:
23        Objection; relevance.
24    THE WITNESS:
25        Yes.

## Page 133

1     MR. TRAHANT:
2         Thank you. I tender the
3 witness.
4         You want to take a break?
5     MS. CUNNINGHAM:
6         Yes, let's take a break and --
7 (whereupon a break in proceedings was held.)
8 EXAMINATION BY MS. CUNNINGHAM:
9     Q.  Mr. Neva, I wanted to go back to your
10 inspection of the Weiss properties --
11    A.  Uh-huh.
12    Q.  -- on Treasure Isle and make sure
13 that's clear in the jury's head.  But you
14 viewed two sites on Treasure Isle that belonged
15 to the Weisses right?
16    A.  That's correct.
17    Q.  And how, in relation to those
18 inspections -- well, let -- let me back up.
19        Do you remember when those inspections
20 took place?
21    A.  November of 2005.
22    Q.  Okay. And of the 125 sites --
23    A.  Uh-huh.
24    Q.  -- you said you inspected --
25    A.  Uh-huh.

1    Q. -- were the Weiss inspections, you
2  know, one of the first ones you did or --
3    A. Yes.
4    Q. -- after you --
5    A. Yes.
6    Q. -- kind of had finished all those?
7    A. Well, they were -- it was one of the
8  first 20 because I think we did about 20 on
9  that first trip, which was the -- my first
10  experience at -- at doing this work.
11    Q. Okay. So what did you understand your
12  role was for Rimkus?
13    A. To gather information that would
14  enable their engineers to write a report and
15  come to a conclusion.
16    Q. Okay. And in gathering that data --
17    A. Uh-huh.
18    Q. -- for the Rimkus engineer what sort
19  of data were you gathering once you got to the
20  site?
21    A. Well, you talk to whoever happens to
22  be out there. Hopefully, it's the property
23  owner which in this case it isn't. If -- if --
24  if the property owner, the insured, isn't able
25  to meet you at the site, which more often than

1  not did happen, you'd talk to anyone else
2  that's out in the area that's might have any
3  kind of information to -- so you -- you
4  basically you gather any informa -- any and all
5  information you can.
6    Q. Uh-huh.
7    A. And, you know, you -- it's better to
8  give the engineer too much information than not
9  enough. You take a lot of photos. You look at
10  the vegetation. You look at other buildings in
11  the neighborhood if there are any. You look at
12  -- that's pretty much what you do in the field.
13    Then you look at -- before you write
14  your report, you look at weather data, you
15  know, how strong of sustained winds did they
16  get, what were the peak gusts, when -- when did
17  they happen, what was the storm surge, when did
18  it happen.
19    You know, basically, you just try to
20  get as much information as you can and -- and
21  -- because the last thing you want is the
22  engineer to call you two months later when
23  you're 2000 miles away and say, well, did you
24  look at this and you have to say -- you don't
25  want to be saying no.

1    Q. All right. And once you -- you gather
2  this data and information what do you do with
3  it?
4    A. I write a -- what I call a
5  preliminary report.
6    Q. Okay. And what does that look like?
7    A. It looks like the -- it's the same
8  format at the final report --
9    Q. Uh-huh.
10    A. -- from Rimkus.
11    Q. Uh-huh. And contains -- what does it
12  contain?
13    A. And let me say also that I think that
14  probably the reason it's in the same form --
15    Q. Uh-huh.
16    A. -- is so that we know what -- the kind
17  of information the engineer is looking for.
18  That's probably why they have it in that
19  format.
20    Q. Okay.
21    A. So -- and what was your question you
22  said?
23    Q. Just -- just what does the -- the
24  preliminary report contain that you would draft
25  after gathering information from the site?

1    A. Well, it contains our observations
2  that -- what did we observe out there.
3  Information on the structure as to how high it
4  was off the ground to the first floor. How
5  many stories it was. Whether it was detached,
6  single family residence or a multi-family
7  residence. What type of roof did it have.
8  What kind of -- type of siding did it have.
9  What direction north, east, south, west did the
10  front of the structure face. Then it has, you
11  know, our -- what kind conclusions we would
12  draw as having made the field inspection.
13    What -- what do we conclude from what
14  we see.
15    Q. And --
16    A. And also --
17    Q. I'm sorry.
18    A. -- the report would have attached
19  photos.
20    Q. Right. And when we just looked at the
21  Rimkus report that Mr. Trahant had directed you
22  to there were photos following the report?
23    A. Uh-huh.
24    Q. Were those photographs you took?
25    A. Yes. They would have been photos

1  either I took or Tao took.
2  Q. When -- when you finish with this
3  preliminary report what --
4  A. Uh-huh.
5  Q. -- what happens to it?
6  A. Okay. Then I e-mail it off to Pacific
7  International Engineering's office in Edmonds.
8  Q. Okay.
9  A. Then, generally within a week, it is
10 then forwarded to Rimkus along with whatever
11 other reports they have. I think they put it
12 on -- put it on a disk and send it off to them
13 is the way they do it.
14 Q. All right.
15 A. So they compile a week's worth of
16 reports on one disk and send -- briefly send a
17 -- send it off.
18 Q. Let me see. And then -- and then once
19 this gets to Rimkus are you aware of what --
20 what happens to the report at that point?
21 A. Not really. Other than, you know,
22 normally, I eventually get a call from the
23 engineer that's going to stamp the report and
24 we go over what I send off.
25 Q. Okay. And did that happen --

1  A. And we discuss it.
2  Q. Okay. Did that happen in this case as
3  to number 13 Treasure Isle?
4  A. Yes, it did.
5  Q. Okay. And who did you speak with at
6  that point about the report for --
7  A. Craig --
8  Q. -- Treasure Isle?
9  A. Craig Rogers.
10 Q. Okay. And obviously you worked with
11 Craig Rogers within Rimkus, right?
12 A. Uh-huh.
13 Q. And in your experience with him what
14 -- what have you learned about his background
15 as far as failure reconstruction?
16 MR. TRAHANT:
17     I would say objection based on
18 hearsay. But --
19 MR. TRAHANT:
20     Yeah. Well, I really -- I
21 -- I -- virtually nothing. I
22 mean, I -- other than you know, I
23 was told that all the engineers
24 that we would be working with at
25 Rimkus were experienced at doing

1  forensic work. I was told this
2  by Gary Bell, the manager.
3  MS. CUNNINGHAM:
4      Okay.
5  THE WITNESS:
6      And so, you know, we -- we
7  were always out there under the
8  assumption that, you know, once
9  we send the report off and a
10 Rimkus engineer reviews that,
11 you know, they were going to be
12 much more experienced in this
13 type of work than us.
14     How many years experience, I
15 couldn't say. I may have asked him at
16 one time. You know it may have come
17 up in conversation but I just don't
18 recall.
19 EXAMINATION BY MS. CUNNINGHAM:
20 Q. And you understood that Mr. Rogers is
21 a licensed Louisiana engineer?
22 A. Yes.
23 Q. And generally what -- what sorts of
24 things would you talk about with the Rimkus
25 engineer once you had submitted your

1  preliminary report?
2  A. Well, a lot of times it was that they
3  want -- they want us to be more detailed in our
4  -- in our analysis or in our observations. Or
5  sometimes it's what am I looking at in photo
6  number six, and do you have a closer -- a
7  close-up, a better photo with a close-up of
8  this connection or that connection. The -- it
9  could be that like, in this case, that a -- a
10 disagreement in the conclusions that I had in
11 mine.
12 Q. And as far as that disagreement in --
13 A. Uh-huh.
14 Q. -- conclusions for the number 13
15 report --
16 A. Uh-huh.
17 Q. -- what did you and Mr. Rogers
18 discuss?
19 MR. TRAHANT:
20     Objection. It calls for a
21 partial response based on
22 hearsay.
23 THE WITNESS:
24     Well, we discussed the fact
25 that I had in there that I

<HR>

Page 142

```
1    concluded that the house was
2    destroyed by tornado based on the
3    way the columns had fallen. And
4    Mr. Rogers, at that point,
5    discussed with me on how --
6    MR. TRAHANT:
7        Objection. Hold on,
8    Mr. Neva.
9    THE WITNESS:
10       Uh-huh.
11   MR. TRAHANT:
12       The court is going to rule
13   on this, but you're not allowed
14   to say what he told you.
15   THE WITNESS:
16       Oh.
17   MS. CUNNINGHAM:
18       Well, that is not true at
19   all. There are lots of
20   exceptions to the hearsay
21   objection. And I would ask that
22   you tell --
23   MR. TRAHANT:
24       Which one are we dealing
25   with here?
```

Page 143

```
1    MS. CUNNINGHAM:
2        Present sense impression.
3    I mean, you can take -- take you
4    pick. But I want to get his
5    testimony on the record.
6    MR. TRAHANT:
7        And I object it's hearsay
8    but you can --
9    MS. CUNNINGHAM:
10       That's fine.
11   MR. TRAHANT:
12       -- continue.
13   MS. GRAVENER:
14       And you can fully answer.
15   THE WITNESS:
16       And so we discussed on how
17   that in his opinion that house
18   could have been destroyed due to
19   storm surge and those columns be
20   lying in a haphazard arrangements
21   as they were.
22   EXAMINATION BY MS. CUNNINGHAM:
23   Q.   And you deferred to Mr. Roger's
24   experience and conclusions for this case,
25   right?
```

Page 144

```
1    A.   Yes. And he also pointed out the fact
2    that there was no evidence --
3    MR. TRAHANT:
4        Objection. It's hearsay, but go
5    ahead.
6    THE WITNESS:
7        No evidence of a tornado
8    strike in the form -- that showed
9    the trees. There was no broken
10   tops. There was one tree that
11   had a broken top out of it and it
12   was about -- the tree was about
13   this big around (indicating),
14   what's that, nine inches in
15   diameter, at the point where it
16   broke about 12 feet up. It could
17   have been something hitting it
18   floating, you know. But -- but
19   there was a lot of trees in a lot
20   of photos that showed no blown
21   out tops.
22   EXAMINATION BY MS. CUNNINGHAM:
23   Q.   All right. After consulting with
24   Mr. Rogers about your report, --
25   A.   Uh-huh.
```

Page 145

```
1    Q.   -- the preliminary report, did you
2    have an opportunity to discuss with him his
3    final conclusions, --
4    A.   Yes.
5    Q.   -- as to the property?
6    A.   Uh-huh.
7    Q.   And his conclusion in this case was
8    that storm surge was the cause of the
9    catastrophic loss --
10   A.   Uh-huh.
11   Q.   -- of the number 13 Treasure Isle
12   property, right?
13   A.   Uh-huh.
14   Q.   And you don't dispute that today here?
15   A.   No.
16   Q.   In fact, you agree with the conclusion
17   in the Rimkus report Mr. Rogers authored,
18   right?
19   A.   Yes.
20   Q.   And if you didn't agree you had an
21   opportunity to say, Look, I don't agree, right?
22   A.   Oh, yes.
23   Q.   And it would have gone through
24   another --
25   A.   Yes.
```

<HR>

1    Q.  -- inspection process, and would have
2  been peer reviewed by --
3    A.  I didn't --
4    Q.  -- someone else?
5    A.  -- feel pressured to -- that I have to
6  agree with -- with any of the engineers.  If
7  they come up with a different conclusion than I
8  have --
9    Q.  Uh-huh.
10    A.  -- I was never told that, you know,
11  that I have to change my conclusion to match
12  their's.
13    Q.  Okay.  And what you got paid
14  on-the-job, for example, wasn't affected by
15  what your conclusions were or whether or not
16  you disagreed with what a Rimkus engineer --
17    A.  Yes.
18    Q.  -- suggested the conclusion would be
19  in his report, right?
20    A.  That's correct.
21    Q.  Okay.  And I'm assuming, tell me if
22  I'm right, that your goal in this process was
23  to make sure that the final report for the
24  number 13 Treasure Isle property was as
25  accurate as possible?

1    A.  That's correct.
2    Q.  And that you had gathered the
3  information needed for Mr. Rogers to make a
4  final conclusion, right?
5    A.  That's correct.
6    Q.  And you don't have any reason to
7  believe that Mr. Rogers was influenced by
8  anything outside of the same goals; an accurate
9  final report?
10    MR. TRAHANT:
11        Objection.  How could he
12    possibly know what's in
13    Mr. Rogers' mind or his intent or
14    motivation for doing something.
15    MS. CUNNINGHAM:
16        I asked him if he had any
17    reason to believe that.
18    THE WITNESS:
19        I have no reason to.
20  EXAMINATION BY MS. CUNNINGHAM:
21    Q.  I guess I need to confirm that today,
22  as we're sitting here talking, you agree with
23  the Rimkus report as drafted by Mr. Rogers?
24    A.  Yes.
25    Q.  I want to clarify for the record, the

1  conversations you had with the Weisses about
2  their property --
3    A.  Uh-huh.
4    Q.  -- and about the Rimkus report?
5    A.  Uh-huh.
6    Q.  Let me read for you paragraph eight
7  of the plaintiffs' complaint.  They state:
8  "During their site inspection Mr. Neva, who
9  appeared to be the lead engineer told the
10  Weisses that the majority of their damage was
11  caused by wind."  Is that your recollection as
12  to the events or the conversations you had with
13  the Weisses at the site inspection?
14    A.  It's possible.  I -- I don't recall.
15  It's very possible.  I do recall stating that
16  it looked like a tornado strike when I first
17  come on the property.  I do recall at the end
18  of the site visit stating to the Weisses that I
19  didn't see anything to the contrary there.
20        I do recall that talking with
21  Mrs. Weiss later, after I got back to
22  Washington, and stating that I was still of
23  that belief, you know, before the final report
24  and before I'd had the change to learn more
25  about torna -- you know, to try and find out

1  more about what a tornado strike would look --
2  would look like.
3    Q.  Right.  And, I mean, when you were
4  speaking with the Weisses did you ever intend
5  for them to take your statement to them as the
6  final conclusion of Rimkus engineers?
7    MR. TRAHANT:
8        Objection.  How could they not?
9    MS. CUNNINGHAM:
10        Well, I'm asking his intent.
11    He's the one saying it.
12    THE WITNESS:
13        I would imagine that the Weisses
14    would have concluded that the final
15    report would have said that.
16  EXAMINATION BY MS. CUNNINGHAM:
17    Q.  And was that your intent?
18    A.  No.  It was not my intent to -- and,
19  you know, I hope that I conveyed to them -- I
20  just -- I don't recall.  But I know that I
21  tried to make a real effort on inspections when
22  dealing with -- especially when dealing with
23  the insureds to let them know that, you know,
24  my opinion is weighed into the process but it's
25  not of the same weight, by any means, as the

<HR>

1  opinion of the person that is -- of the
2  licensed engineer that's stamping the report.
3      They're much more experienced and
4  basically we're in an, like I said, we're in an
5  information gathering mode as -- that's my
6  role. I am asked for an opinion in this
7  process. I am asked to come to a conclusion,
8  but it's -- it's the conclusion of more
9  experienced people that carries more weight.
10     Q.  After viewing -- well, you mentioned
11 earlier, I believe, that your site inspection
12 of the number 13 Treasure Isle property was
13 early on in --
14     A.  Uh-huh.
15     Q.  -- your time down here during Katrina?
16     A.  Uh-huh.
17     Q.  After viewing Treasure Isle had you
18 had opportunity or did you have an opportunity
19 to observe property sites where it was
20 determined that a tornado had struck?
21     A.  Yes.
22     Q.  Okay.  And what -- what was the type
23 of damage that you saw in those circumstances
24 that alerted you to the possibility that a
25 tornado may have struck?

1      A.  The dramatic difference in a very
2  short distance from -- and quite often it was
3  in a given structure.  Half the structure would
4  be gone and the other half is still standing.
5  It not only intact but it has very little,
6  even, shingles off -- missing off the roof.
7      You'll find -- in some cases you --
8  you'll find where you have a group of homes,
9  maybe a half a dozen homes, completely
10 destroyed and then all of a sudden there's a
11 whole area of homes with very minor damage, you
12 know.
13     So it's really where I observed, you
14 know, tornado strikes that were confirmed,
15 through the process as a being tornado strikes,
16 that's generally what -- what the evidence
17 showed was -- and you'd find trees with, you
18 know, the tops blown out of them, and -- but it
19 was very dramatic destruction in a very
20 confined space --
21     Q.  And how --
22     A.  -- versus over a broad area.
23     Q.  How does that -- let me ask, how does
24 that compare, what you just described to what
25 you saw on Treasure Isle around the Weiss

1  property?
2      A.  Well, basically in Treasure Isle, I
3  mean, pretty much, as I recall, you know, there
4  was very little structural -- structures that
5  remained standing.  That's my recollection.
6  Like I said, year-and-a-half since I was out
7  there.
8      Q.  Right.  So as opposed to confined or
9  sporadic damage as you would see with tornado
10 strikes, as you've just described, on Treasure
11 Isle when you reviewed it you saw more
12 consistent damage across the board?
13     A.  Yes.
14     Q.  Is that fair to say?
15     A.  (Nods head.)
16     Q.  Let me show you this first, the
17 document that was provided to us from Rimkus
18 yesterday.  In fact, it's just the first one
19 I'm talking about there.
20     And, Mr. Neva, this is a document, I'm
21 not sure what it's going to be marked
22 ultimately at trial, I'm going to mark it A for
23 this deposition.
24     This appears to be an e-mail dated
25 December 29, 2005.

1      A.  Uh-huh.
2      Q.  Have you seen this e-mail before,
3  Mr. Neva?
4      A.  I don't believe so.
5      Q.  Okay.  Is that your e-mail address up
6  at the top, jimn@piengr.com?
7      A.  Yes.  So it was sent to me.
8      Q.  Let me ask you this way.  You did
9  preliminary reports for number 13 and number 14
10 Treasure Isle?
11     A.  Yes.
12     Q.  Okay.  And what I want to do if
13 refresh your recollection as to when you would
14 have completed the preliminary report for
15 number 14 Treasure Isle.
16     A.  Uh-huh.
17     Q.  You'll see the date of this e-mail is
18 December 29, 2005, and third paragraph -- well,
19 I guess that's the second paragraph down, it
20 states, "I set up a new job s-h-t and then it
21 says attached.  5200561 for 14 Treasure Isle
22 with its claim number 5113267719.  Jim, since
23 you inspected 14 Treasure Isle would you write
24 the report for Bill as soon as you can."
25     A.  Uh-huh.

Page 154

1  Q.  Does that refresh your recollection at
2  all as to when you were writing the number 14
3  Treasure Isle report?
4  A.  Yeah. I mean, I recall, though, the
5  confusion over 13/14.
6  Q.  Okay. What was that?
7  A.  Everybody seemed to be consistent that
8  it was the house, the big house that they
9  wanted, but until we had another job order,
10  from Rimkus I would not have written the second
11  report.
12  Q.  Okay.
13  A.  I wouldn't think I would have. And
14  that's my recollection is that I didn't, that I
15  waited until, you know, that -- until PIE got a
16  firm assignment from Rimkus to do the other
17  one. Because up until then I'm out my field
18  time. I'm not out the time of writing the
19  report.
20  Q.  If you'll turn with me, Mr. Neva, to
21  -- let me give you a copy of this document.
22      MS. CUNNINGHAM:
23      Rick, Mr. Trahant, it's to the
24      end of the pile of the Rimkus stuff.
25      THE WITNESS:

Page 155

1      Uh-huh.
2      MS. CUNNINGHAM:
3      I think it's actually --
4      MR. TRAHANT:
5      He's probably got it there in
6      front of him somewhere.
7      MS. CUNNINGHAM:
8      Oh, okay.
9  EXAMINATION BY MS. CUNNINGHAM:
10  Q.  This also is a document that Rimkus
11  provided to Mr. Trahant in response to a
12  subpoena.
13  A.  Uh-huh.
14  Q.  And I wanted to check with you -- and,
15  again, I'm going to label this B for the
16  deposition and I don't know what it'll be
17  labeled at trial, but I just -- I wanted to
18  confirm with you or ask you if you've ever seen
19  this document before?
20  A.  Well, this is my handwriting.
21  Q.  Okay. This is your handwriting. And
22  what was this? What is it?
23  A.  This is a protocol checklist.
24  Q.  Okay.
25  A.  When we first started working out

Page 156

1  there we weren't required to do protocol
2  checklists --
3  Q.  Okay.
4  A.  -- and sketches of the property and
5  all that stuff. The -- this was probably
6  filled out after I already did my report, you
7  know, when all of a sudden then they started
8  requiring -- Allstate started requiring
9  protocol checklists. Then a few months later
10  then Allstate was requiring sketches. So we'd
11  have to go back to sites and do sketches and --
12  and then send them off, you know.
13  Q.  So you --
14  A.  But at the time of the Weiss or the
15  Weiss inspection we were not required to do
16  protocol checklists or sketches.
17  Q.  Okay. And just as a frame of
18  reference if you look at the top of the
19  document there's a fax tag on it dated January
20  18, 2006 is that around the time that you
21  completed this engineering protocol?
22  A.  Yeah.
23  Q.  And this was --
24  A.  Yeah.
25  Q.  -- after you had inspected --

Page 157

1  A.  Uh-huh.
2  Q.  -- the Weiss property, right?
3  A.  Uh-huh.
4  Q.  And after you had submitted --
5  A.  Uh-huh.
6  Q.  -- your preliminary report --
7  A.  Uh-huh.
8  Q.  -- on November 13th, right?
9      MR. TRAHANT:
10      Wait, wait. Meredith, let him
11      answer.
12      MS. CUNNINGHAM:
13      I'm sorry.
14      MR. TRAHANT:
15      You're asking questions --
16      THE WITNESS:
17      That's correct.
18      MR. TRAHANT:
19      -- like a machine gun.
20      THE WITNESS:
21      That's correct. So I would -- I
22      did this. I filled this checklist out
23      down at what I used to call my beach
24      house. I went over to the Port of
25      Peninsula's office and then faxed it

<HR>

1      off to -- to Pacific International
2      Engineering.
3  EXAMINATION BY MS. CUNNINGHAM:
4      Q. I want to give you another document
5  that was also produced to us from Rimkus.
6  You've seen copies of it before.
7      I'm going to mark this as Exhibit C
8  for the record. Again, we don't know what
9  it'll be at trial, --
10     A. Uh-huh.
11     Q. -- but I'm showing you a copy of the
12 report that Rimkus had provided to us. We've
13 been obviously talking about it throughout your
14 testimony.
15     What I wanted to do is have you flip
16 to the back of the report and confirm for us
17 that the photographs attached to the report are
18 the ones that you took when you visited the
19 site.
20     MR. TRAHANT:
21         Are those Bates stamped,
22     Meredith?
23     MS. CUNNINGHAM:
24         No, I didn't Bates stamp
25     them.

1      MR. TRAHANT:
2          I think it's at 290 through
3      292 in the big book.
4      MS. CUNNINGHAM:
5          And we can reference these
6      as the same photographs located
7      at A-L-S-T-W-E-I-S 290 through
8      292.
9  EXAMINATION BY MS. CUNNINGHAM:
10     Q. And those are your photographs,
11 Mr. Neva?
12     A. Yes, they are my photographs.
13     MS. CUNNINGHAM:
14         Let me take a short break if I
15     may.
16 (Whereupon a break in proceedings was held.)
17 EXAMINATION BY MS. CUNNINGHAM:
18     Q. Mr. Neva, have you -- you're not a
19 meteorolo -- I can't say it. I didn't want to
20 have to say it on the record.
21     A. Meteorologist?
22     Q. Meteorologist, thank you.
23     A. No.
24     Q. You're not one of those, are you?
25     A. I'm not a weather man either.

1      Q. All right. You've never been
2  submitted or offered to a court as an expert in
3  meteorology?
4      A. No.
5      Q. Okay. Now, you described a process
6  where at Rimkus if a report or if the field
7  engineer and the report engineer disagreed --
8      A. Uh-huh.
9      Q. -- on the conclusions --
10     A. Uh-huh.
11     Q. -- and the final report it would go
12 through the procedure all over again with new
13 engineers, right?
14     A. That's what I was told would happen.
15     Q. Okay. And that did not happen here --
16     A. No.
17     Q. -- with the number 13 property?
18     A. No.
19     Q. Okay. And then when you viewed the
20 number 13 property in November of 2005, number
21 13 Treasure Isle, --
22     A. Uh-huh.
23     Q. -- were there adjacent properties to
24 -- structures that were still existing or had
25 everything been wiped to the slab?

1      A. All along Treasure Isle?
2      Q. On either side of the number 13
3  property, adjacent to the number 13 property.
4      A. My recollection is that the properties
5  adjacent to them were also destroyed.
6      Q. Okay.
7      A. That's my recollection. 14 was
8  adjacent to 13 and they were both destroyed.
9  And I don't recall a structure on 12 or 15.
10     Q. And when we say "destroyed," you mean
11 only a slab --
12     A. Yes.
13     Q. -- existed?
14     A. Yes.
15     MS. CUNNINGHAM:
16         No further questions. Thank you.
17     MR. TRAHANT:
18         I have some questions on
19     redirect, Mr. Neva.
20     THE WITNESS:
21         Uh-huh.
22 EXAMINATION BY MR. TRAHANT:
23     Q. You said that you'd defer to Mr.
24 Rogers and I wrote it down in quotes, "because
25 they were experienced at doing forensic

## Page 162

1  work;" --
2      A.  Uh-huh.
3      Q.  -- is that correct?
4      A.  Uh-huh.
5      Q.  And is that the position that you have
6  here today, Mr. Neva, that because Mr. Rogers,
7  from your perspective, was more experienced at
8  doing forensic work you'd defer to him and
9  agreed with his ultimate conclusion?
10     A.  I would say -- I would say that I
11 allowed him to convince me of his conclusion.
12 I never took the position that I would let one
13 of their engineers talk me into a conclusion
14 without convincing me of that conclusion.
15     Q.  Okay.  So --
16     A.  Or getting me to agree to a conclusion
17 that -- without being convinced that -- that
18 they were right --
19     Q.  And that, of course, --
20     A.  -- or correct.
21     Q.  -- was based on his experience --
22     A.  Correct.
23     Q.  -- as a forensic --
24     A.  Correct.
25     Q.  -- forensic --

## Page 163

1      A.  Correct.
2      Q.  -- engineer?
3      A.  (No response.)
4      Q.  Then would it follow that if -- if
5  Leonard Quick has significantly more experience
6  in forensic engineering than does Mr. Rogers
7  you might also be willing to defer to
8  Mr. Quick?
9      MS. CUNNINGHAM:
10         Objection; assumes facts in
11     evidence and is vague as well.
12     MR. TRAHANT:
13         You can answer.
14     THE WITNESS:
15         If I discussed the report with
16     Mr. Quick there's a possibility, yes.
17 EXAMINATION BY MR. TRAHANT:
18     Q.  Did Allstate make you aware that Mr.
19 Quick has also been retained by Allstate to do
20 Hurricane Katrina claims?
21     MS. CUNNINGHAM:
22         Objection; irrelevant.
23     THE WITNESS:
24         No.
25 EXAMINATION BY MR. TRAHANT:

## Page 164

1      Q.  You didn't know that, did you?
2      MS. CUNNINGHAM:
3         Irrelevant.
4  EXAMINATION BY MR. TRAHANT:
5      Q.  Did you know that Mr. Quick worked for
6  Rimkus at Rimkus's inception as an engineering
7  firm?
8      MS. CUNNINGHAM:
9         Objection; relevance.
10     THE WITNESS:
11         No.
12 EXAMINATION BY MR. TRAHANT:
13     Q.  You didn't know that?
14     A.  I had never heard of Mr. Quick before.
15     Q.  Okay.  And Mr. Quick did a pretty
16 thorough engineering report, correct?
17     MS. CUNNINGHAM:
18         Objection; relevance.  We're not
19     looking at the report.
20     MR. TRAHANT:
21         You've read it, correct?
22     THE WITNESS:
23         Yeah.
24     MS. CUNNINGHAM:
25         It assumes facts not in

## Page 165

1  evidence and it's a vague
2  question.
3      THE WITNESS:
4         It appears to be a thorough
5  report.
6  EXAMINATION BY MR. TRAHANT:
7      Q.  Okay.  And did you have occasion to do
8  inspections of any homes in the Rigolets
9  Estates?
10     A.  If I understand what the Rigolets
11 Estates is.
12     Q.  Okay.
13     A.  That's --
14     Q.  What I would ask you to do is to turn
15 to page -- it's the photographs of Mr. Quick's
16 report.
17     MS. CUNNINGHAM:
18         You know, let me object.  This
19     goes way beyond what I went through on
20     cross.  And this is supposed to be
21     redirect I would understand as what I
22     discussed with Mr. Neva, and you're
23     going into stuff that you should have
24     gone into during direct.
25     MR. TRAHANT:

1    Okay. Let me respond to that by
2  first saying, I certainly think the
3  questions I'm going to ask him are
4  within the scope --
5    MS. CUNNINGHAM:
6    Okay.
7    MR. TRAHANT:
8    -- of your cross. Second, I
9  would -- I would politely ask that one
10 counsel speak, particularly a lawyer
11 who is not mic'd up, not reaffirm or
12 say anything as my co-counsel has not.
13 EXAMINATION BY MR. TRAHANT:
14   Q. That being the case, we talked about
15 and Ms. Cunningham questioned you with respect
16 to your acquiescing with Mr. Rogers that the
17 storm surge may have likely carried the
18 structure away; do you recall that?
19   A. Yes.
20   Q. The Rigolets Estates was right across
21 a bayou beyond Treasure Isle actually to the
22 east; do you recall that subdivision?
23   MS. CUNNINGHAM:
24   Let me --
25   MR. TRAHANT:

1    And I'm pointing to the
2  waterfront line on photograph number
3  36.
4    MS. CUNNINGHAM:
5    Let me object again. We're
6  discussing facts not in evidence with
7  a report that --
8    THE WITNESS:
9    I -- I --
10   MS. CUNNINGHAM:
11   -- you know, there's no
12 foundation for these photographs at
13 this point in time.
14   THE WITNESS:
15   I believe I recall that. That
16 development over there?
17   MR. TRAHANT:
18   Yeah.
19   THE WITNESS:
20   I never did any inspections
21 there.
22 EXAMINATION BY MR. TRAHANT:
23   Q. Okay. You knew that from what you saw
24 virtually none of those houses were carried
25 away by the storm surge, correct?

1    A. Well, it appeared that there was an
2  awful lot of homes still standing over there.
3  I -- like I said, I never even drove over there
4  so. But, yeah, it -- it looked like a newer
5  development, you know. I didn't know how they
6  were constructing stuff, but that it looked
7  like one of the areas that weathered
8  substantially better.
9    Q. That would indicate -- well, let me
10 rephrase this.
11   The level of destruction on the
12 waterfront property in the Rigolets Estates did
13 not come close to matching the level of
14 destruction on Treasure Isle, did it?
15   MS. CUNNINGHAM:
16   Objection. It assumes facts not
17 in evidence.
18   THE WITNESS:
19   It appeared to because I -- but I
20 never went over there like I -- like I
21 said. But, yeah, that's --
22 EXAMINATION BY MR. TRAHANT:
23   Q. That's true from what you observed,
24 correct?
25   A. From what I observed.

1    Q. Okay. Now, certainly, Mr. Neva,
2  Rimkus retained the photographs you sent to
3  them, correct?
4    A. The only photographs I sent to them
5  were attached with the report.
6    Q. Okay. And that would have been --
7    A. I believe that's the only photographs.
8  I could be wrong. I may have -- I may have
9  sent a CD that had all the photos I took.
10   Q. Okay.
11   A. Because it seems -- yeah. Well, I
12 know I sent it to Pacific International
13 Engineering. I sent all my photos on disk to
14 Pacific International.
15   Q. Okay. And do you think that would
16 have been at the same time that you sent your
17 draft report?
18   A. No. I believe it was later.
19   Q. Okay.
20   A. When they started asking for this. It
21 could have been six months later.
22   Q. Okay. Did you acquiesce to
23 Mr. Rogers's theory because of the height of
24 the storm surge?
25   MS. CUNNINGHAM:

<HR>

## Page 170

1    Objection; lack of foundation.
2   That's not what he said.
3   THE WITNESS:
4    Well, if I didn't think that the
5   storm surge reached the footing I
6   wouldn't have agreed that storm surge
7   destroyed it.
8   EXAMINATION BY MR. TRAHANT:
9    Q. Meaning that if the maximum height of
10  the storm surge was 14 feet and the bottom
11  floor of the house was 17 feet and at the peak
12  of the storm surge was not the peak of the
13  winds that would affect your opinion as you sit
14  here today, correct?
15   MS. CUNNINGHAM:
16    Objection; lack of foundation, --
17   THE WITNESS:
18    If I was con --
19   MS. CUNNINGHAM:
20    -- and we assert the Daubert
21  objections.
22   THE WITNESS:
23    If I was convinced that the water
24  got to 14 foot elevation and the
25  floor, first floor, was at 18 feet

## Page 171

1   elevation I would not have agreed that
2   it was destroyed by storm surge.
3    Unle --
4   EXAMINATION BY MR. TRAHANT:
5    Q. And assuming that to be the case
6   you're not going to rule out your original
7   hypothesis that it was a tornado strike,
8   correct?
9   MS. CUNNINGHAM:
10    Objection; --
11   THE WITNESS:
12    That's correct.
13   MS. CUNNINGHAM:
14    -- lack of foundation.
15   MR. TRAHANT:
16    Okay.
17   THE WITNESS:
18    But I believe it was storm
19  surge.
20  EXAMINATION BY MR. TRAHANT:
21   Q. Even -- even if it is established that
22  the height of the water was 14 feet and that
23  the bottom floor of the house was anywhere from
24  16 to 18 feet --
25   A. Yeah.

## Page 172

1    Q. -- you would change that opinion,
2   wouldn't you?
3    A. Yes, I would change it.
4    MS. CUNNINGHAM:
5     Objection. It's calling for
6   speculation, assuming facts not
7   in evidence, lack of foundation,
8   and our Daubert objections that
9   we asserted earlier.
10   MR. TRAHANT:
11    I want to say this, Mr. Neva, and
12  I think for a change I can speak on
13  behalf of everyone in the room, you
14  have our sincerest gratitude for
15  coming here --
16   MS. CUNNINGHAM:
17    Yes.
18   MR. TRAHANT:
19    -- without a subpoena, traveling
20  across the country. I thank you and I
21  can on behalf of Ms. Cunningham and
22  the Weisses thank you as well.
23   THE WITNESS:
24    Right thing to do.
25   MR. TRAHANT:

## Page 173

1    Thank you.
2   MS. CUNNINGHAM:
3    We really appreciate it.
4   (Whereupon videotaped deposition was
5    concluded.)

<HR>

Page 174

1      REPORTER'S PAGE
2
3          I, TERRI WEBER WENNING, Certified
4   Court Reporter, in and for the State of
5   Louisiana, the officer, as defined in Rule 28
6   of the Federal Rules of Civil Procedure and/or
7   Article 1434 (B) of the Louisiana Code of Civil
8   Procedure, before whom this sworn testimony was
9   taken, do hereby state on the Record;
10         That due to the interaction in the
11  spontaneous discourse of this proceeding,
12  dashes (--) have been used to indicate pauses,
13  changes in thought, and/or talkovers; that same
14  is the proper method for a Court Reporter's
15  transcription or proceeding, and that dashes
16  (--) do not indicate that words or phrases have
17  been left out of this transcript; That any
18  words and/or names which could not be verified
19  through reference material have been denoted
20  with the phrase "spelled phonetically."
21
22
23
24         TERRI WEBER WENNING, RPR, CCR
25           Certified Court Reporter

Page 175

1      C E R T I F I C A T E
2
3          I, TERRI WEBER WENNING,
4   Certified Court Reporter, in and of the State
5   of Louisiana, do hereby certify that the
6   above-named witness, after having been first
7   duly sworn by me to testify to the truth, did
8   testify as hereinabove set forth;
9
10         That the testimony was reported
11  by me in shorthand and transcribed under my
12  personal direction and supervision, and is a
13  true and correct transcript, to the best of my
14  ability and understanding;
15
16         That I am not of counsel, not
17  related to counsel of the parties hereto, and
18  not in any way interested in the outcome of
19  this suit.
20
21
22
23         TERRI WEBER WENNING, RPR, CCR
24           Certified Court Reporter
25           Louisiana License #98006