# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MERRYL D. WEISS, wife of/and | * | |
| ROBERT U. WEISS, JR., M.D. | * | CIVIL ACTION NO.; 06-cv-3774 |
| | * | |
| VERSUS | * | JUDGE: VANCE (R) |
| | * | |
| ALLSTATE INSURANCE COMPANY | * | MAGISTRATE CHASEZ (5) |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DECLARATION OF HARVEY ROSENFELD
### IN SUPPORT OF MOTION TO INTERVENE AND
### OPPOSITION TO SEALING OF TRIAL EXHIBITS

I, HARVEY ROSENFIELD, being duly sworn in accordance with law, hereby declare as follows:

1.  I am an attorney duly licensed to practice law in the State of California. I am the founder of and counsel to The Foundation for Taxpayer and Consumer Rights ("FTCR"). I have also worked at the Federal Trade Commission, the U.S. Congress, in private practice, as a staff attorney for Public Citizen Congress Watch, and as the Program Director for the California Public Interest Research Group.

2.  FTCR is a non profit, nonpartisan, tax-exempt consumer research, education, litigation and advocacy organization founded in 1985 to speak out on behalf of consumers and taxpayers.

3.  Among other things, FTCR is dedicated to the protection of insurance consumers' interests both in California and nationwide. FTCR's core mission in this area is to defend, enforce and implement the provisions of California Proposition 103 and other consumer protection measures enacted for the benefit of consumers and policyholders. In furtherance of this goal, FTCR collects information concerning insurance industry abuses

from the public, publishes this information for the public, lawmakers and judicial experts, advocates legislation on behalf of policyholders, and, in cases such as the present one, participates in litigation to protect policyholders against unfair practices by insurance companies.

4. The passage of Proposition 103 in California has blocked over $20 billion in rate increases in auto, home and business insurance, and forced insurance companies to refund $1.2 billion to California policy holders, stopped unfair surcharges, and reduced the number of uninsured motorists.

5. FTCR's recent insurance consumer advocacy includes:

- intervening on behalf of California consumers to challenge unjustified rate increases; FTCR's legal work has blocked over $800 million in rate increases between 2003 and 2007, including $530.25 million in savings for purchasers of home and earthquake coverage;

- successfully combating insurance industry efforts to pass new legislation overturning Proposition 103;

- sponsoring regulations to enforce the underwriting protections mandated by Proposition 103;

- lobbying the California Legislature to close the revolving door between lawmakers and the insurance industry that enabled one Assemblyman to accept an executive position at one of the nation's largest insurance companies immediately after leaving his post as Chair of the Assembly Insurance Committee; and

- publicizing campaign donations made by the insurance industry to California

politicians.

6. FTCR is presently an intervener in a proceeding before the California Department of Insurance to require Allstate to lower its homeowner and automobile insurance rates.

7. FTCR also participated in the controversial debate in the state legislature over the enactment of a state earthquake agency in 1996 in response to the insurance industry's decision, in the aftermath of the 1994 Northridge, California earthquake, to withdraw from the sale of that insurance.

8. Through our work in this area, FTCR has learned that homeowner insurance, though required to buy a house or maintain a mortgage, is becoming increasingly unresponsive to consumer and homeowner needs. At the same time, coverage disputes have increased as insurers, for financial reasons, refuse to pay legitimate claims properly. Despite laws that require insurers to pay claims promptly and for the full amount covered by the policy, many consumers learn only upon filing a claim that getting an insurance company to pay a claim can be a difficult and stressful experience.

9. Nothing has illustrated this problem more vividly than the conduct of insurance companies in the aftermath of Hurricane Katrina, which has caused a nationwide uproar over seemingly unfair treatment of homeowners with respect to their insurance policies. As illustrated in the news articles attached hereto as Exhibit A, Allstate Insurance Company has been at the center of this controversy by making it extremely difficult for homeowners to recover the insurance proceeds to which they are entitled. Allstate's claims handling policies have been challenged as a violation of its contractual agreements with its policyholders and a violation of state insurance laws.

3

10. It is my understanding that the documents at issue in this case were initially produced subject to a Magistrate Judge's discovery protective order, but were later entered into open evidence during trial. Allstate now moves the court to reseal what was open to the public during trial.

11. In FTCR's view, the documents at issue, which include an Allstate claims-handling manual and an operational guide for an Allstate subcontractor, are of enormous importance to the public interest, not only in Louisiana but nationwide. Among other things, they provide insight into Allstate's decision-making process whereby it evaluated claims entered by homeowners in Katrina's wake.

12. As a practical matter, by seeking to seal documents entered into open evidence at the thirteenth hour, Allstate aims to hide its practices from policyholders, policymakers, the press and the public, with profound consequences.

13. An order sealing the trial exhibits will bar public access to important information regarding Allstate's insurance practices – an issue that is important not only in Louisiana, but also in other geographical areas threatened by natural disasters. Allstate is the second largest home insurer in the nation, with a market share over 12%. Many of its policyholders reside in locations where the threat of storms and other natural disasters are important considerations in the purchase of insurance. For instance, both FTCR and the California State Insurance Commissioner have criticized Allstate during the last few months for requesting a 12.2% rate increase for homeowners policies in California due to potential earthquake and fire liability, at the same time that other major homeowners insurance providers have lowered rates in California by about $1 billion. FTCR has

intervened in an administrative hearing to challenge the increase requested by Allstate. Shortly after the Insurance Commissioner and FTCR announced their investigations into its rate policies, Allstate announced it would stop selling new homeowners policies in California as of July 1, 2007. *See* Exhibit B.

14.    If the documents at issue are sealed, the efforts of FTCR and other organizations to educate the public about Allstate's practices – in particular, its handling of claims for damage to policyholders' homes due to natural disasters – will be seriously harmed. The documents at issue are necessary to provide FTCR and consumers with an understanding of how Allstate may evaluate such claims.

15.    The same considerations also apply to state regulators in Louisiana and elsewhere. State regulatory agencies simply do not have adequate resources to pursue all necessary investigations. State insurance regulators often rely upon litigants within the judicial system to ferret out violations of state claims handling laws. In my opinion, sealing the documents will greatly hinder the ability of insurance regulators to monitor Allstate's practices and enforce applicable state laws.

16.    Moreover, regulators, lawmakers and the public need to understand how the coverage provided by Allstate and its claims handling practices interact with federal programs such as flood insurance that are funded by taxpayers.

17.    Finally, sealing the documents will also make pending litigation filed against Allstate immeasurably more difficult for other plaintiffs. To the extent that Allstate has engaged in improper conduct or fraud in order to avoid payment of claims, the information contained in the documents Allstate seeks to seal is critical to the proper and efficient

operation of the judicial process. If Allstate's motion is successful, it will force plaintiffs in other actions against Allstate (particularly in claims arising out of Hurricane Katrina) to re-engage in costly and extensive discovery disputes that are similar to, if not exactly the same as, those that took place in the instant case. Such disputes would not only be enormously expensive and time-consuming for such plaintiffs, but would also constitute a waste of judicial resources.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on this _30_ day of July, 2007.

HARVEY ROSENFIELD

Dated: _7/30/07_

# EXHIBIT A

Times-Picayune (New Orleans)

April 5, 2007 Thursday

# Allstate case takes aim at engineers;
# Homeowners claim report manipulated

**BYLINE:** By Rebecca Mowbray, Business writer

**SECTION:** MONEY; Pg. 1

**LENGTH:** 1553 words

All that remained of Merryl and Robert Weiss' three-story home on Lake Pontchartrain in Slidell was some rubble, a few broken concrete pilings and a slab after Hurricane Katrina charged across the Treasure Isle peninsula.

When engineers hired by Allstate Insurance Co. inspected the property in November 2005, they said the home was destroyed by a tornado before the storm surge carried away its remnants.

But the Weisses never were able to get a copy of the original engineering report. After months of calling Allstate and the engineering company, Rimkus Consulting Group Inc. , the Weisses say they were told that the report had been delayed and was being "revised." When they finally got a copy in February 2006, the conclusions didn't match what they had been told.

"The extent of damage due to wind could not be determined," say excerpts of the report filed in court. "The complete destruction and removal of debris was consistent with damages due to storm surge."

Merryl Weiss called the Rimkus engineer who inspected their home. He replied that he did not have "the final say" and that the conclusions were "out of his hands."

Allstate says that if Katrina's storm surge was strong enough to take out the nearby I-10 twin spans, it was strong enough to take out the Weiss' house, and there was nothing shady going on with the engineering report. Allstate says its structure adjuster diligently checked on the status of the report and provided it as soon as it was completed.

"The engineer report, prepared by Rimkus Consulting Group, was posted in early February 2006," according to court documents.

The Weisses don't buy it, and the dispute over whether their losses should be covered by homeowners insurance comes to trial Monday at 8:30 a.m. in U.S. District Court in New Orleans in the second jury trial in federal court in Louisiana since the storm.

Allan Kanner, head of the insurance section at the Louisiana Association for Justice, formerly known as the trial lawyers association, said that the Weiss case is an important venue for issues to be explored in Louisiana.

"This is an important case in that it gets to the whole issue is of how objective are the so-called experts, and are you dealing with preordained results?" he said. "The insurance company is supposedly working for you in adjusting your claim, yet they hire these people who couldn't care less about you. They care about their ongoing relationship with the insurance company."

Neither side returned phone calls seeking comment for this story, but the details of the litigation are laid out in the pretrial order for the case.

In February, the first federal trial, also an Allstate case, was withdrawn several days into the proceedings amid questions of fraud by the plaintiffs. Because of that wobbly first step into Katrina litigation, and because the Weiss v. Allstate case contains some of the issues that are more typical of situations in Louisiana with both flooding and wind damage, Randy Maniloff, an insurance defense attorney in Philadelphia who has been following the Katrina litigation, says this is the real test case.

"This is the real first case," Maniloff said. "It could become the barometer for other cases."

First full airing

First cases are significant as the first time the legal community, insurers and the public have a chance to see how juries react. Once a few rulings have come down, insurers often start settling, Maniloff said, as State Farm has done in Mississippi.

In Mississippi, where many people lacked flood insurance, cases dealt with whether damage from storm surge was properly excluded from homeowners policies, Maniloff said. But in the New Orleans area, which has some of the highest National Flood Insurance Program participation rates in the country, the legal questions will be more about how the flood policy and the wind policy interact.

Homeowners would seem to be covering all their bases by purchasing flood and homeowners insurance, Maniloff said, but because the flood program only sells up to $250,000 in structural coverage, many people will find themselves short and look for wind damage.

In this case, the Weisses say the replacement value of their home was $612,500 and that most of the upper two stories of their home would have been above the tidal surge because the main floor of their home was 18.1 feet above sea-level and the tidal surge was 15 to 20 feet.

"If the Weisses weren't restricted by the $250,000 limits, would this case really be going to trial here?" Maniloff said. "This will put a spotlight on the fact that the flood insurance limits are clearly too low."

The Weisses received the $250,000 maximum under their flood insurance policy and $39,150 from Allstate for structural damage under their homeowners policy. The Weisses say the flood insurance payment was only supposed to cover losses on the ground floor; Allstate disputes that characterization.

Allstate also disagrees with the Weiss' assessment of the value of their home and says that the replacement cost value of the home was $318,260 and the depreciated value is $299,163. Allstate says the Weisses were adequately compensated and, because they purchased a new home elsewhere in Slidell, their benefits should be determined by the cost of their new home minus the land value, according to their policy terms.

"That amount is $320,316, which further establishes that plaintiffs have no further claim on their homeowner policy for their dwelling. In any event, Allstate properly handled plaintiffs' claim and did not act arbitrarily or capriciously," according to the pretrial order.

For Allstate, Maniloff said, a key question is, how the company determined the wind damage when the house was destroyed? For the homeowners, the question is, if they accepted a total loss check for flood damage, how can they really turn around and say it's wind damage?

But to get to those questions, Maniloff said, Allstate will have to deal with the engineering report questions, because they'll grab the jury's attention and feed into insurance conspiracy theories.

"It resonates with jurors," Maniloff said. "Whether it's true or not is irrelevant, but it could have an inflammatory impact against insurance companies."

Questions of manipulation

Insurance companies turn to engineering reports when the cause of loss is uncertain. Such reports haven't been a big issue so far in Louisiana after Hurricanes Katrina and Rita, but they have been in other places, where policyholders have charged that companies have doctored reports to help them deny claims instead of using them as a tool to determine what really happened.

After tornadoes killed 36 people in Oklahoma and caused $450 million in damage in 1999, a jury found that Haag Engineering Co. of Houston created reports "predetermined" to side with State Farm Insurance Co., which was found to have denied claims "intentionally and with malice," according to news reports.

More recently in Mississippi, Attorney General Jim Hood's investigation of State Farm hinged on whether reports by the Birmingham, Ala., adjusting firm of E.A. Renfroe & Co. were used to low-ball or deny claims after two whistle-blowers bolted with 15,000 pages of internal documents. Hood concluded his investigation without charges in January when State Farm and lawyer Dickie Scruggs came up with their initial settlement proposal, but Mississippi Congressman Gene Taylor, a Democrat from Bay St. Louis, has continued the inquiry.

Indeed, in a January letter to Rep. Barney Frank, D-Mass., who chairs the House Committee on Financial Services, Taylor wrote, "There are numerous reports of instances in which insurance companies or their contractors revised engineering reports or requested new reports if the original report found wind damage."

Kanner of the insurance section at the Louisiana Association for Justice said that engineering reports will be particularly important in cases from St. Tammany, St. Bernard and Plaquemines parishes. "All of the cases outside the levee system are going to have wind engineers, and they're going to be crucial," Kanner said.

Apples or oranges?

Another thing to watch for in the case is whether Judge Sarah Vance allows testimony on how Allstate handled other claims in the area.

The Weisses say that at least two of their neighbors received the full value of their homeowners policies from Allstate because of a combination of wind and water damage. They say the discrepancy between their situation and their neighbors' is evidence of arbitrary and bad faith claims handling.

Allstate says that each property is different, and slight variations in location or construction style or age of the home can affect how resilient the properties are to storms. Allstate requests that other adjustments be excluded as hearsay.

Some federal cases in Mississippi have excluded adjustment information from nearby homes, Maniloff said, but some judges in Orleans Parish Civil District Court have been allowing it, Kanner said.

Bob Hunter, director of insurance at the Consumer Federation of America, said that people learn a lot about how insurance companies operate in big disasters, because neighbors talk and compare claims.

"We learn things when these big storms happen. When we have a bunch of claims all at once as we did in Katrina, these things become much more obvious," he said.

LOAD-DATE: April 5, 2007

LANGUAGE: ENGLISH

PUBLICATION-TYPE: Newspaper

3

Times-Picayune (New Orleans)

April 10, 2007 Tuesday

# Couple, insurer face off in storm lawsuit; Misrepresentation, fraud are alleged

**BYLINE:** By Rebecca Mowbray, Business writer

**SECTION:** MONEY; Pg. 1

**LENGTH:** 885 words

In opening arguments of the second insurance trial in federal court in Louisiana, a lawyer for the Slidell couple who lost their home in Hurricane Katrina contended that notes by two separate Allstate **Insurance** Co. adjusters show that the adjusters believed the Lake Pontchartrain home was destroyed by Katrina's winds, and his clients are owed hundreds of thousands of dollars in additional insurance proceeds under their homeowners insurance policy.

Notations by two separate insurance adjusters in October 2005 and comments by a team of engineers in November 2005 show that Robert and Merryl Weiss' Slidell home was destroyed by Hurricane Katrina's winds, not its waves, attorney Richard Trahant told eight U.S. District Court jurors Monday.

"This, ladies and gentlemen, was the original determination," said Trahant, who charged that Allstate then changed the engineering reports on the house to conclude that the home was demolished by Katrina's storm surge by someone who never visited the property.

But Allstate attorney Judy Barrasso said there is no original, missing report. Adjusters call an engineering consulting firm in complex cases, because they're not qualified to make a judgment on what caused the loss. The people from the engineering firm who visit the house merely collect the information, and give it to an engineer who weighs all the information about the home, the destruction and the weather to determine the cause of loss, she said. It's common for the engineer who writes the report not to visit the house, she said.

Allstate says that it is the homeowners who committed fraud, because the Weisses have claimed that a boathouse that was lost in the storm was really on a neighboring property, and shouldn't have been on the policy that's in dispute.

In these dueling accusations of fraud and misrepresentation, each side accuses the other of trying to distract the jury from the real issues.

For the Weisses, the real issue is that they believe they were not properly compensated by their homeowners insurance policy for the loss of their home, which they say will cost more than $600,000 to rebuild. They have received $250,000 in structural coverage from their National Flood Insurance Program policy and $39,000 from Allstate for losses to their home.

For Allstate, the real issue is the cause of the loss and the replacement value of the home. Allstate says the actual loss is closer to $300,000, and most of that loss properly belongs on the flood insurance policy, where it has been paid. "Don't get sidetracked," Barrasso said.

The case is expected to take most of this week in Judge Sarah Vance's courtroom. Witnesses will include insurance agents, adjusters, engineers, builders and appraisers. Arguments opened with a trip via Google Earth

4

satellite images from New Orleans to the Weiss' home on Treasure Isle in Slidell, with pictures of their "dream home" on Lake Pontchartrain, and the pile of rubble that remained after the storm.

Trahant said that meteorological reports will show that Katrina's western eye-wall passed directly over the Weiss' home and that eye-walls often have strong and rapidly shifting winds that can do damage similar to a tornado. He notes that at least two of the Weisses' neighbors who are insured by Allstate were fully compensated by their homeowners policies, and says the disparities with the nearby adjustments can't be reconciled.

"The purpose of insurance is to make people whole," Trahant said. "My clients haven't even been made half."

But Barrasso said that while Allstate is sorry for the Weiss' loss, it's not responsible for paying for it because the house was destroyed by Katrina's Category 5 storm surge, not its Category 2 winds. "Most of the damage to the Weiss' house was caused by storm surge and wave action," Barrasso said.

Weather data does not support the idea of tornadoes in the area, Barrasso said. If the storm surge was strong enough to take out the twin spans of I-10 crossing Lake Pontchartrain, the waves were certainly strong enough to take out the concrete pilings holding up the Weiss' house, she said, noting that the Weiss residence was outside the levee system. As for the neighbors' homes, the strength of pilings varies greatly depending on whether they're round or square, and how many there are.

Allstate notes that although the Weisses made a number of changes to their insurance policies over the years, they never quibbled with the value of the policy, which Allstate had raised to $343,000 before the storm in 2005.

Barrasso said that the Weisses' argument that their home was underinsured on its homeowners policy and that the house wasn't really destroyed by water defies logic.

"Dr. Weiss never said, 'This is not my replacement cost. This is not what my house is worth.' Dr. Weiss is a sophisticated doctor, and he would not insure his house for what it was worth?" Barrasso said. "If there was some kind of error, wouldn't they have called somebody?"

But Trahant said that it is Allstate that is obfuscating, and instructed the federal jury to stay on point. "Who is it that's misrepresenting? You get to make that decision," Trahant said. "You are the first jury to sit in a wind versus water case in Louisiana."

. . . . . . .

Rebecca Mowbray can be reached at rmowbray@timespicayune.com or at (504) 826-3417.

**LOAD-DATE:** April 10, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Times-Picayune (New Orleans)

May 20, 2007 Sunday

# Inflated flood claim turns up at trial;
# Allstate contents list is news to owners

**BYLINE:** By Rebecca Mowbray, Business writer

**SECTION:** NATIONAL; Pg. 1

**LENGTH:** 1050 words

Fishing poles and fancy furs weren't the issues at trial. Instead, Merryl and Robert Weiss had gone to court to fight the contention by their insurer, Allstate, that they were entitled to only a pittance under their homeowner policy because flooding, not wind, was largely responsible for the destruction of their home on Slidell's Treasure Isle.

But about a month before trial, Merryl Weiss realized there was something wrong with the payment for household contents that they had received on their obliterated Slidell home.

In making the claim under their taxpayer-subsidized National Flood Insurance policy, Weiss had given Allstate a handwritten list of belongings from the ground floor of the three-story house -- most of it rods, reels and other gear owned by her husband, a retired doctor who is a die-hard sport fisherman with a charter boat license. She valued the lost contents at $38,848.35.

But as documents were being flashed in front of her for identification, Weiss was shown a typed property-loss worksheet totaling $139,562. The inventory listed a formal living room, dining room, kitchen, living room/great room/game room, an office, a foyer, bathrooms, five bedrooms, a garage/shed, utility room, clothes, miscellaneous items and categories labeled "DVDs/VCRs/records" and "jewelry, furs, memorabilia, etc."

Weiss didn't generate the list, and never submitted a contents list for the upstairs rooms of the home to Allstate before the flood contents check was cut. Indeed, she said she doesn't own any furs. But Allstate submitted the bill to the National Flood Insurance program, which paid the policy's limit of $100,000 for contents after depreciation and a deductible were taken out.

"I never even claimed that we had any of this stuff," Weiss said in her deposition. "I did not write this, and I did not write this," she said, pointing to items on the list.

Mysterious paperwork

At last month's trial, the Weisses were awarded a $2.8 million judgment against Allstate for failing to properly adjust the claim, an award that the insurer is appealing. That settled, at least temporarily, a fight over wind versus flood damage. But the unanswered question was how the Weisses' contents claim got inflated by $100,714. No one seemed to have an explanation.

Not Mike Wells, the outside adjuster employed by Allstate to handle the claim. He testified that he had given the Weisses' handwritten list of fishing equipment to Allstate.

Not Mung Hatter, who worked for four months processing Allstate claims before landing her current job at Beau Rivage casino on the Mississippi coast. Hatter testified that she simply put the finishing touches on the claim using the numbers the company gave her before supervisors signed off on the settlement and it was mailed to the flood program for payment.

'Quality control measures'

On the fourth day of the trial at the federal courthouse on Camp Street, Paul Tracey, field operation's manager for Allstate's catastrophe unit, was asked point blank by Weiss attorney Richard Trahant how the contents figures grew.

"Do you have any idea how those numbers increased from $38,000 to $139,000?" Trahant asked.

Tracey said he could explain how the process works, and he hastened to say that Allstate handled claims honorably.

"We . . . have quality control measures under our policy, under our process, to ensure that the evaluations are being done correctly and accurately. The federal government also reinspects our work for the National Flood Insurance Program," Tracey said.

But that didn't explain the inflated and imaginative contents list. To counter the implication that there was something underhanded going on with the list, Allstate lawyer Judy Barrasso asked Tracey what was to prevent Allstate from dumping costs onto the flood policy so as to spare Allstate the expense of a settlement under the homeowner policy.

"In handling these claims, what's to stop Allstate from just putting all of somebody's claim as a flood loss instead of a wind loss?" Barrasso asked.

"Well, number one, we don't do that. . . . If there's damages from wind, we pay it under the wind; if there's damages from flood, we pay it under the flood," he responded.

Destroyed by tornado

The Weisses said they limited their contents claim under the flood policy to the ground floor of their house because storm surge estimates suggested that the upper two floors were above the water line. Based on early conversations with their adjuster and an engineer who visited the house in November 2005, they believed their house was destroyed by a tornado.

In trial testimony, Hatter said the inflated contents list named an Alabama contract worker as adjuster. The contract worker could not be found for the trial and efforts by The Times-Picayune to contact her were unsuccessful. Hatter said that after getting the list from the contract worker, she typed up the claim and circulated it for approvals from higher-ups at Allstate before sending it to the flood program for payment.

Hatter testified that Allstate had programs in place to monitor what lower-level contract workers were doing with computerized claims. In his testimony, Tracey affirmed that everything Hatter would have done went up the ladder and was approved by someone at Allstate before it was submitted by the government.

Didn't call Allstate

At deposition, Allstate attorney Meredith Cunningham asked Weiss why she didn't notice that they were being overpaid by the flood program and why they didn't say anything about it when they realized the discrepancy.

"When you received a check for $100,000 for the contents . . . did you ever ask anybody at Allstate why am I getting an extra, you know, tens of thousands dollars more than I intended to get on this coverage?" Cunningham asked.

Weiss said that in the barrage of paperwork after the storm, she didn't read everything in the envelope that came with the checks.

"I knew it would all come out in the end one way or another. I mean, why would I call Allstate and say, 'Wait, you gave me too much money here,' when I'm waiting on another . . . $600,000?" Weiss said. "I assumed that in the end, all of this would be evened out. I never asked for more than I thought we should have."

. . . . . . .

Rebecca **Mowbray** can be reached at rmowbray@timespicayune.com or (504) 826-3417.

**LOAD-DATE:** May 20, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The Times-Picayune Publishing Company

Times-Picayune (New Orleans)

July 15, 2007 Sunday

# LEANING ON INSURERS;
Michael Homan's house has been dangerously off-kilter since Hurricane Katrina, but his **insurance** company has left him twisting in the wind. So he's fighting back.

BYLINE: By Rebecca Mowbray, Business writer

SECTION: MONEY; Pg. 1

LENGTH: 1719 words

Standing in Michael Homan's Mid-City home brings about a slightly queasy feeling of vertigo.

Floors slope sharply to the left, doors quickly slam shut under the pull of gravity and boards that should be at right angles aren't.

The house has been leaning dangerously since Hurricane Katrina, when the Xavier University theology professor felt the house twisting in the wind like a boat in rough seas before one strong gust sent it lurching to the left.

"During the storm it was windy, windy, windy and all of a sudden it got hammered in these big gusts," said Homan, who escaped with his two dogs and the help of some firefighters from Phoenix. He walked most of the way to LaPlace after the levee breaches filled his elevated home with about 3 feet of water.

Homan and his wife Therese Fitzpatrick, a public school teacher, should have been able to repair their home and move on with their lives because they had flood insurance and homeowners **insurance** on their 215 S. Alexander St. home.

Instead, they're living down the street while two enormous braces prop up their empty home to keep it from falling over. They have filed for Road Home grant money and are suing Allstate **Insurance** Co. for paying them only $3,944.73 on their homeowners **insurance** claim for wind damage that they say will cost tens of thousands of dollars to fix. Their house has been deemed a total loss.

"They just nickel and dimed us to death," Homan said. "Our problem was the structural damage. It would have been so easy for them in the beginning to have maxed out the policy."

As the Road Home grant program confronts a $5 billion shortfall, the line of applicants includes people like the Homan-Fitzpatricks, who had **insurance** to cover most of the Katrina repair bills but found themselves with uncompensated wind damage that has delayed the region's recovery.

Walter Leger, head of the housing and redevelopment task force at the Louisiana Recovery Authority, says he has no idea how many people who were insured but unable to collect on their policies ended up in line for the Road Home program, but he suspects that the Homan-Fitzpatricks are not alone.

"I think there's probably quite a few. They probably are deterred by the fact that to really fight your **insurance** company, you have to have an attorney. That probably hinders a lot of people," said Leger, a lawyer.

Leger said it's probably easier for people to sign up for the Road Home than to battle their insurance companies, especially since the amount is often only a few tens of thousands of dollars. "The insurance company's job is to give you as little as they can."

The Washington, D.C., nonprofit Taxpayers Against Fraud, said it sounds like the Road Home program is as much a public subsidy to the insurance industry as it is a program to help disaster victims.

"Right now the Road Home program sounds to me like it's being used as an enabler for companies shirking their responsibility and ripping off taxpayers," said Patrick Burns, communications director for the group. "This is a situation in which the system is set up to transfer the liability to the federal government while transferring the profit to the company."

Skinny kitchen

Homan is generally satisfied with the $73,000 he got in flood insurance for his home. He's got his quibbles, such as a few appliances missing from the estimate and his kitchen being measured as an impossibly skinny 2.5 feet wide, but by and large he feels as though the money from the federal flood insurance program will be sufficient to fix his flood damage.

But the homeowners insurance claim with Allstate is a different story. About 10 adjusters visited the house as Homan believes that the Northbrook, Ill., company was trying to drag out his claim and wear him down.

To Homan, the signs are fairly obvious that the slow-rising floodwaters that crept into his house in the wee morning hours the Tuesday after the storm were not the cause of the structural damage, and that the lean of the house was clearly new with the storm.

Unpainted portions of the windows and clapboards were revealed when the house shifted to the left, as the boards separated from where they had resided for most of the past century, revealing unweathered wood. The powerful Greek columns supporting the two story home's upper gallery have split lengthwise under the duress, again revealing unweathered wood. And the house next door is leaning in the same direction as Homan's.

When the team from Haag Engineering Co. finally made it to the house in February 2006 on an inspection that had been ordered in October 2005, the engineers concluded that the tilt was a pre-existing condition. "It was leaning like this before Katrina, is what they're saying," Homan said.

Haag didn't really want to talk with them and was at the property for less than 15 minutes. Homan said he got the feeling the engineers' minds were made up before they arrived. "We knew something was up. They didn't want to talk to us. They were just here for a few minutes," Homan said.

Because the house was at such a lean that he couldn't shut and lock the front door, at some point after the storm, Homan cut a triangle off the bottom of the front door and attached it to the opposite corner of the top of the door to make it fit. When the Haag engineers saw the oddly shaped door, they pointed to it as proof of their conclusion that the damage was long-standing.

"They said, 'Aha. The house was leaning before the storm,' " Homan said. "They ignored all this other evidence."

When Homan finally got the engineering report several months later, it referred to the "Wilson" house and had a picture of someone else's home.

Allstate declined comment on Homan's situation and the Road Home.

"We don't typically discuss individual customer situations," Allstate spokeswoman Kate Hollcraft said. "Allstate has already settled 98 percent of our Katrina-related claims in Louisiana. Each case is considered individually based on the facts and information presented. We continue to work with our customers to resolve any remaining claims."

David Margulies, a spokesman for Haag Engineering, said his company was unaware of any problem with the engineering report of Homan's house.

"Haag is not familiar with this particular individual, but if someone brings an issue to our attention, we will research it and address it," Margulies said.

Sending a signal

Because they needed money to repair and couldn't afford to wait for Allstate, Homan and his family decided to apply to the Road Home program to make up for what Allstate won't pay.

Homan and his family recently were awarded $150,000 from the Road Home: $30,000 to elevate, because their property missed qualifying for ICC by a few inches, and $120,000 for structure damage that was unpaid by insurance.

Despite the Road Home award, Homan and Fitzpatrick are not withdrawing their insurance lawsuit because they feel it's important to send a signal to insurance companies that they need to pay the people who bought policies from them.

"We'd be much happier if they paid our bills instead of taxpayers," Homan said. "I just feel that they've behaved unethically through the whole process. We also have nothing to lose, so we might be their worst enemy."

Burns' group tracks whistleblower lawsuits such as the New Orleans suit unsealed in May that alleges that insurance companies systematically overbilled the federal flood program for hurricane damage while underpaying wind claims. He says the best way for the federal government to help hurricane victims is not to provide rebuilding grants to people who haven't tapped out their insurance, but rather to throw its weight behind a few strong insurance cases against each company to send a message to private industry that the government cares whether it pays its obligations.

"This is a case where government can help, but maybe the best way for government to help isn't to write a check, it's to send a lawyer and a legal brief," Burns said.

Homan and his family applied to the Road Home program because they couldn't wait any longer on Allstate and because the program allows them to recover legal fees for pursuing the company.

Burns applauded Homan and Fitzpatrick for continuing their insurance claim on behalf of others even as their own rebuilding needs have now been addressed.

"He has the immediate need of taking care of this family, and he also has this larger sense of community and national pride. He knows what is right for his family now is wrong for his family over time. My hat's off to him," Burns said. "Will the government please help this man?"

Holding up the money

The Homans' decision to pursue Allstate is also a relief to Louisiana Recovery Authority.

"Good for him," Leger said. "We're all fighting to get more money from Washington. If you assume that his claim is legitimate, the insurance company is holding up Road Home money that could help someone else."

When people get Road Home money, they agree to assign any future insurance benefits to the state of Louisiana, which also reserves the right to pursue insurance claims. Leger said Louisiana Recovery Authority has had several meetings with the attorney general's office about pursuing those claims.

Kris Wartelle, a spokeswoman for state Attorney General Charles Foti, said that key people were out of town and she was unable to comment on what's happening with the Road Home and insurance.

11

"We are considering looking into some LRA issues. Whether they encompass what you're talking about, I couldn't say," she said.

But Leger takes issue with Taxpayers Against Fraud's charge that the Louisiana Recovery Authority should have prioritized Road Home awards to avoid subsidizing the insurance industry.

Who should have received priority? The uninsured? The elderly? Those with special needs? Those in a certain part of the state? Those below a certain income level? Or those like Homan who took care to buy insurance, but who have been unsuccessful in fighting their insurance companies? Just even identifying people in these groups would have been cumbersome, Leger said.

"I understand the sentiment, and it is a good sentiment, but deciding who gets to the line first is difficult." Leger said. "That's my point: How do you define the most needy?"

. . . . . . .

Rebecca Mowbray can be reached at rmowbray@timespicayune.com or (504) 826-3417.

LOAD-DATE: July 15, 2007

LANGUAGE: ENGLISH

GRAPHIC: STAFF PHOTO BY MATT ROSE
Michael Homan stands outside his leaning home on South Alexander Street. He had the house braced on the inside to reinforce it to keep it from falling down completely. [3297829]
STAFF PHOTO BY MATT ROSE
Michael Homan's home is braced on the inside to reinforce it after being heavily damaged by Hurricane Katrina's winds. 'During the storm it was windy, windy, windy and all of a sudden it got hammered in these big gusts,' Homan said. [3297827]
STAFF PHOTO BY MATT ROSE
The powerful Greek columns supporting the upper gallery of Michael Homan's two-story home have split lengthwise under the duress, again revealing unweathered wood. [3297826]

PUBLICATION-TYPE: Newspaper

Copyright 2007 The Times-Picayune Publishing Company

Times-Picayune (New Orleans)

May 20, 2007 Sunday

# Inflated flood claim turns up at trial;
# Allstate contents list is news to owners

**BYLINE:** By Rebecca Mowbray, Business writer

**SECTION:** NATIONAL; Pg. 1

**LENGTH:** 1050 words

Fishing poles and fancy furs weren't the issues at trial. Instead, Merryl and Robert Weiss had gone to court to fight the contention by their insurer, Allstate, that they were entitled to only a pittance under their homeowner policy because flooding, not wind, was largely responsible for the destruction of their home on Slidell's Treasure Isle.

But about a month before trial, Merryl Weiss realized there was something wrong with the payment for household contents that they had received on their obliterated Slidell home.

In making the claim under their taxpayer-subsidized National Flood Insurance policy, Weiss had given Allstate a handwritten list of belongings from the ground floor of the three-story house -- most of it rods, reels and other gear owned by her husband, a retired doctor who is a die-hard sport fisherman with a charter boat license. She valued the lost contents at $38,848.35.

But as documents were being flashed in front of her for identification, Weiss was shown a typed property-loss worksheet totaling $139,562. The inventory listed a formal living room, dining room, kitchen, living room/great room/game room, an office, a foyer, bathrooms, five bedrooms, a garage/shed, utility room, clothes, miscellaneous items and categories labeled "DVDs/VCRs/records" and "jewelry, furs, memorabilia, etc."

Weiss didn't generate the list, and never submitted a contents list for the upstairs rooms of the home to Allstate before the flood contents check was cut. Indeed, she said she doesn't own any furs. But Allstate submitted the bill to the National Flood Insurance program, which paid the policy's limit of $100,000 for contents after depreciation and a deductible were taken out.

"I never even claimed that we had any of this stuff," Weiss said in her deposition. "I did not write this, and I did not write this," she said, pointing to items on the list.

Mysterious paperwork

At last month's trial, the Weisses were awarded a $2.8 million judgment against Allstate for failing to properly adjust the claim, an award that the insurer is appealing. That settled, at least temporarily, a fight over wind versus flood damage. But the unanswered question was how the Weisses' contents claim got inflated by $100,714. No one seemed to have an explanation.

Not Mike Wells, the outside adjuster employed by Allstate to handle the claim. He testified that he had given the Weisses' handwritten list of fishing equipment to Allstate.

Not Mung Hatter, who worked for four months processing Allstate claims before landing her current job at Beau Rivage casino on the Mississippi coast. Hatter testified that she simply put the finishing touches on the claim using the numbers the company gave her before supervisors signed off on the settlement and it was mailed to the flood

program for payment.

'Quality control measures'

On the fourth day of the trial at the federal courthouse on Camp Street, Paul Tracey, field operation's manager for Allstate's catastrophe unit, was asked point blank by Weiss attorney Richard Trahant how the contents figures grew.

"Do you have any idea how those numbers increased from $38,000 to $139,000?" Trahant asked.

Tracey said he could explain how the process works, and he hastened to say that Allstate handled claims honorably.

"We . . . have quality control measures under our policy, under our process, to ensure that the evaluations are being done correctly and accurately. The federal government also reinspects our work for the National Flood Insurance Program," Tracey said.

But that didn't explain the inflated and imaginative contents list. To counter the implication that there was something underhanded going on with the list, Allstate lawyer Judy Barrasso asked Tracey what was to prevent Allstate from dumping costs onto the flood policy so as to spare Allstate the expense of a settlement under the homeowner policy.

"In handling these claims, what's to stop Allstate from just putting all of somebody's claim as a flood loss instead of a wind loss?" Barrasso asked.

"Well, number one, we don't do that. . . . If there's damages from wind, we pay it under the wind; if there's damages from flood, we pay it under the flood," he responded.

Destroyed by tornado

The Weisses said they limited their contents claim under the flood policy to the ground floor of their house because storm surge estimates suggested that the upper two floors were above the water line. Based on early conversations with their adjuster and an engineer who visited the house in November 2005, they believed their house was destroyed by a tornado.

In trial testimony, Hatter said the inflated contents list named an Alabama contract worker as adjuster. The contract worker could not be found for the trial and efforts by The Times-Picayune to contact her were unsuccessful. Hatter said that after getting the list from the contract worker, she typed up the claim and circulated it for approvals from higher-ups at Allstate before sending it to the flood program for payment.

Hatter testified that Allstate had programs in place to monitor what lower-level contract workers were doing with computerized claims. In his testimony, Tracey affirmed that everything Hatter would have done went up the ladder and was approved by someone at Allstate before it was submitted by the government.

Didn't call Allstate

At deposition, Allstate attorney Meredith Cunningham asked Weiss why she didn't notice that they were being overpaid by the flood program and why they didn't say anything about it when they realized the discrepancy.

"When you received a check for $100,000 for the contents . . . did you ever ask anybody at Allstate why am I getting an extra, you know, tens of thousands dollars more than I intended to get on this coverage?" Cunningham asked.

Weiss said that in the barrage of paperwork after the storm, she didn't read everything in the envelope that came with the checks.

"I knew it would all come out in the end one way or another. I mean, why would I call Allstate and say, 'Wait, you gave me too much money here,' when I'm waiting on another . . . $600,000?" Weiss said. "I assumed that in the

14

end, all of this would be evened out. I never asked for more than I thought we should have."

. . . . . . .

Rebecca Mowbray can be reached at rmowbray@timespicayune.com or (504) 826-3417.

**LOAD-DATE:** May 20, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The Times-Picayune Publishing Company

7/21/07 Times-Picayune 1
2007 WLNR 13954925

New Orleans Times Picayune
Copyright 2007 The Times-Picayune Publishing Corporation.   All Rights
Reserved.   Used by NewsBank with Permission.

July 21, 2007


Section: MONEY

# Allstate asks La. judge to seal papers
## Documents part of record in trial

Rebecca Mowbray Business writer

In a broad quest for secrecy, Allstate Insurance Co. has asked a federal judge
to seal hundreds of pages of documents that were introduced as evidence in
Louisiana's first completed federal trial of a Katrina insurance dispute.

Documents introduced at a public trial are generally available for public
inspection after the case ends. But Allstate wants the judge to take the
unusual steps of reclaiming those records now in the hands of the plaintiff
and then either seal them or return them to Allstate.

Attorneys for the plaintiff, Slidell doctor Robert Weiss, have refused to
return the documents, which include Allstate's Katrina claims-handling manual
and other instructions. They contend that the documents are part of the public
record.

The Weisses won a $2.8 million judgment against Allstate after charging that
the insurer shortchanged them for storm damage to their home on Treasure Isle
in Slidell. They later settled the case for an undisclosed sum.

Their case gained additional notoriety when the Weisses claimed to have
discovered through the litigation case that Allstate submitted a claim to the
federal flood insurance program for flood-damaged items they did not own,
including a fur coat. The Weiss content list has been used by critics of the
insurance industry who claim the private firms were overcharging the
taxpayer-financed flood insurance program. For the tens of thousands of homes
in Louisiana that sustained flood and wind damage, private insurers typically
decided how much of the destruction was to be covered by the federal program
and how much would come out of their own profits.

Charles Miller, an attorney at the Insurance Law Center in Berkeley, Calif.,
said Allstate's secrecy request is part of a trend where insurance companies
try to seal court documents.

"Based upon my experience as a consultant and expert witness in insurance
claims cases, over the last 10 to 15 years, I've seen it almost invariably
happen that insurance companies seek protective orders for their

16

claims-handling documents when they are sued by their policyholders," said Miller, who wrote an article on the topic in this month's issue of Trial magazine.

As part of discovery in the Weiss case, the plaintiff's attorneys had asked Allstate to produce claims manuals and other documents used by field adjusters in handling homeowners' insurance claims.

Over the winter, Allstate agreed to produce the documents, according to court records, but only if the sensitive papers could be entered into the court record under seal, because the company said they contained trade secrets. Under a Feb. 15 order, the Weiss attorneys were given the documents, but told to keep them confidential and return them after the conclusion of the litigation.

When the case went to trial in April, the documents were admitted into evidence, including the claims-handling manual, an operational guide for Allstate subcontractor Pilot Catastrophe Services Inc. and an Allstate document outlining Louisiana issues.

In court filings this week, Allstate argued that the secrecy order remains in place. The company asked the court to order Weiss attorneys Richard Trahant, Jack Morris and John Denenea to return the exhibit binders to Allstate or for the court to place the sensitive exhibits under seal.

Such actions are "done as a matter of course" in insurance trials, Allstate's motion says.

The Weiss attorneys have refused, saying in a motion that "any documents which might have been protected by the Protective Order lost their confidentiality when they were placed into the public record, not under seal, during the highly publicized trial of this matter."

The document dispute is scheduled to be heard Aug. 8 by Judge Sarah Vance.

. . . . . . .

Rebecca Mowbray can be reached at rmowbray@timespicayune.com or (504) 826-3417.

Word Count: 761
7/21/07 NOTPCN 1
END OF DOCUMENT

# EXHIBIT B

5/24/07 L.A. Times 1
2007 WLNR 9718970

Los Angeles Times
Copyright 2007 Los Angeles Times

May 24, 2007

Section: Business

INSURANCE
State to grill <u>Allstate</u> on premiums
Marc Lifsher
Times Staff Writer

Infobox (text included here)

Nearly 1 million customers of <u>Allstate Corp</u>. appear to be paying too much for home insurance and may get partial refunds, California Insurance Commissioner Steve Poizner said Wednesday.

He ordered the insurance giant to face hearings this summer before an administrative law judge. If the judge and Poizner conclude that rates are excessive, the commissioner said he would seek refunds that could total millions of dollars.

"I am drawing a line in the sand," Poizner said. "If I find that Allstate's rates are excessive, refunds will occur. I will take clear and decisive action to protect consumers."

It's much too soon to know how large individual refunds could be or when they might occur. This is the first time the state has sought such refunds, and experts foresee a lengthy court battle.

Wednesday's action was the boldest move yet by Poizner, a Silicon Valley Republican who took office in January.

It may also inflame an already testy relationship between Poizner and Allstate. Two weeks ago, Allstate said that it would no longer issue new home policies in California and that it would continue to seek a

12.2% price increase for its existing customers.

The company says it needs the rate increase to build reserves against the risk of wildfires and fires caused by earthquakes.

Northbrook, Ill.-based Allstate called its rates fair.

"The facts are that Allstate's California homeowners insurance rates currently in place were reviewed and approved by the California Department of Insurance in 2003, and our policies are competitively priced," spokesman Rich Halberg said in a statement.

He said the company looked forward to defending its rates in the hearing.

The company's stance on rates is in stark contrast to pricing by its major competitors.

In recent months, market leader State Farm Mutual Automobile Insurance Co. slashed its premiums 20% and No. 2 Farmers Insurance Group cut its rates 18%. Many of Allstate's rivals now say they plan to expand their homeowner business in California, in part by wooing Allstate's customers.

The Department of Insurance estimates that Californians saved about $1 billion on their home insurance bills in the last year as part of the negotiated rate reductions.

Poizner said he was concerned that Allstate's rates were too high "given that other insurance companies that are significant competitors are dropping their rates."

He noted that Allstate now paid only about 40 cents to settle claims for every dollar of premiums it received. That figure is "historically very low for any insurance company," Poizner said.

From 1996 to 2005, Allstate paid an average of 56 cents in claims per dollar of premiums received, according to Department of Insurance statistics.

Consumer advocates hailed Poizner's order against Allstate as an aggressive move to discipline a company that they say has not treated policyholders fairly in hurricane-prone areas. In addition to California, Allstate has stopped writing new homeowner policies in all or parts of 15 hurricane-prone states on the Gulf and Atlantic coasts.

"The fact that Poizner is taking a firm stand is good for California and, hopefully, will reverberate across the country," said Amy Bach, executive director of San Francisco-based consumer advocacy group United Policyholders.

But industry lobbyists in Sacramento cautioned that the commissioner might be going too far. They

2

questioned whether Poizner had the legal authority, under Proposition 103, a landmark insurance initiative approved by voters in 1988, to order refunds on rates that had been approved by state regulators.

"The commissioner has the authority to call hearings to determine if rates are excessive, inadequate or unfairly discriminatory," said Sam Sorich, president of the Assn. of California Insurance Companies. "But it's prospective. Nothing in Proposition 103 talks about refunding rates."

Sorich, whose organization includes Allstate, predicted that the insurer would fight any eventual refund order in California's courts "because there is no authority for the commissioner to make such an order."

But Douglas Heller, executive director of the Foundation for Taxpayer and Consumer Rights in Santa Monica, contends that Proposition 103 puts Poizner on firm ground to call for premium refunds, if merited.

"Proposition 103 is very clear that insurance companies can't overcharge customers," he said.

Heller, whose group has legal status to participate in the Allstate rate case at the Department of Insurance, estimates that the company's rates for homeowner policies are 40% too high. Preliminary calculations indicate that each homeowner policyholder should get a refund of as much as $362, he said.

Other insurers "lowered their rates when they got out of whack," Heller said. "Allstate left its rates out of whack and its policyholders are paying for it."

*

marc.lifsher@latimes.com

*

Begin text of infobox

Bucking the trend

Allstate is seeking an increase in premiums for California home insurance, while rivals have lowered their rates in the last year.

Allstate: +12.2%

Farmers: -18%

3

Hartford: -18%

Safeco: -20%

State Farm: -20%

USAA: -27%

*

Source: California Department of Insurance

---- INDEX REFERENCES ----

COMPANY: <u>ALLSTATE CORP</u>; FARMERS AND MERCHANTS BANK; FARMERS INSURANCE CO INC; STATE FARM MUTUAL AUTOMOBILE INS CO; STATE FARM; <u>ALLSTATE CORP</u> (THE); STATE FARM LIFE AND ACCIDENT ASSURANCE CO; FARMERS MERCHANTS INVESTMENT INC; FARMERS <u>MERCHANTS BANCORP INC</u>; <u>SAFECO CORP</u>

NEWS SUBJECT: (Legal (1LE33); Major Corporations (1MA93); Economics & Trade (1EC26))

INDUSTRY: (Insurance Regulatory (1IN40); Personal Property & Casualty Insurance (1PE46); Property & Casualty Insurance (1PR21); Insurance Industry Legal Issues (1IN64); Automobile Insurance (1AU51); Financial Services (1FI37); Insurance (1IN97); Financial Services Regulatory (1FI03))

REGION: (Americas (1AM92); North America (1NO39); USA (1US73); California (1CA98))

Language: EN

OTHER INDEXING: (ALLSTATE; ALLSTATE CORP; CALIFORNIA; CALIFORNIA DEPARTMENT OF INSURANCE; CALIFORNIA INSURANCE; DEPARTMENT OF INSURANCE; FARMERS; FARMERS INSURANCE GROUP; FOUNDATION FOR TAXPAYER AND CONSUMER; INSURANCE; SAFECO; SILICON VALLEY REPUBLICAN; STATE FARM; STATE FARM MUTUAL AUTOMOBILE INSURANCE CO; UNITED POLICYHOLDERS) (Amy Bach; Begin; Douglas Heller; Heller; Northbrook; Poizner; Rich Halberg; Sam Sorich; Sorich; Steve Poizner)

KEYWORDS: ALLSTATE CORP; HOMEOWNERS INSURANCE; OVERCHARGING; REFUNDS

EDITION: Home Edition

Word Count: 1033

4

5/24/07 LATIMES 1
END OF DOCUMENT

Los Angeles Business Journal
May 25, 2007

by Staff Reporters

# Poll: Allstate should be banned for next 10 years

Citing the increased risk from losses such as earthquakes and fires, Allstate will stop selling new homeowners policies and landlord policies for rental units in California beginning July 1.

In turn, the Foundation for Taxpayer and Consumer Rights has suggested that the insurance commissioner bans Allstate from returning fully to selling new homeowners policies in the state for at least 10 years.

But what do you think? This week, we asked in an informal poll: Should Allstate be banned from re-entering the state and selling policies for 10 years?

A majority of respondents, 60 percent, said that Allstate should be banned, because they abandoned the new homeowners policy market and should face some form of punishment for the decision.

Next, 36 percent said that the company shouldn't be banned, because they made a business decision.

Four percent of respondents said they were not sure.

Among the varied comments left by respondents:

"Allstate has bad business practices for many years. 10 years is light, I would ban them forever."

"It's called free enterprise."

"They are looking at the reality in California. There will be a major earthquake. It's the 'when' that is scaring Allstate. And until they can realize a way to provide reasonable coverage I cannot blame them for backing out of the market."

"No one should be allowed to sell only what they want when the want in a regulated industry like insurance. There should be a penalty for breaking the public trust."

"Losing a major insurer is not good for the state. It spreads the risk of a major catastrophe over a lesser group of insurers and puts California homeowners at greater risk. California should try to elect an insurance commissioner who is not using the office as an immediate springboard for a higher office."

This week, we look at the increasing practice of employers checking on prospective employees' blogs and profiles on social networking Web sites, such as Santa Monica's MySpace to gather information.

Should employers check blogs and social networking sites to gather information about job applicants

and employees?

# Press Releases

NEWS RELEASE
May 23, 2007

CONTACT: Carmen Balber, (310) 392-0522 ext. 324

## Allstate Overcharging CA Homeowners $900K A Day, $362 Average Annual Refund to Each Homeowner

Santa Monica, CA -- Allstate must repay its California policyholders the $326 million a year it has been overcharging homeowners, said the Foundation for Taxpayer and Consumer Rights (FTCR) in response to today's order by Insurance Commissioner Poizner requiring Allstate to justify its current premiums or refund excessive rates.

Allstate's homeowners business has been extremely profitable in recent years; the company paid out just 33.6 cents on the premium dollar in California homeowners claims in 2005 and just 25 cents on the dollar in 2004.

"It's time Allstate stopped stalling and repaid the $900,000 a day it is overcharging California homeowners. Allstate's outrageous profits on the backs of California homeowners make direct consumer refunds long overdue. We applaud Commissioner Poizner's actions today," said Carmen Balber, consumer advocate with FTCR.

Using voter-approved Proposition 103, FTCR has been pushing for a 40% reduction in Allstate's homeowners rates, a reduction that would save individual policyholders an average $362 a year. Allstate instead wants a $100 million (12%) increase in rates.

The office of the Insurance Commissioner asked Allstate and three other insurers last year to justify their homeowners insurance rates in light of extraordinary profits. The others agreed to lower rates but Allstate delayed, instead insisting on a rate increase. The delay has allowed the company to continue to overcharge consumers.

Proposition 103 requires insurance companies to justify rate changes prior to imposing increases, and allows consumer groups like FTCR to challenge excessive rates and request public hearings.

- 30 -

FTCR is California's leading public interest watchdog. For more information, visit us on the web at www.ConsumerWatchdog.org.